**THOMAS & DUFFIELD DRILLING CO.,**
a corporation, Plaintiff in Error,

v.

Russell COBB, Jr., Defendant in Error.

No. 40487.

Supreme Court of Oklahoma.

July 7, 1964.

Rehearing Denied Feb. 2, 1965.

Steven E. Smith, Tulsa, for plaintiff in error.

Robert W. Raynolds, Ronald G. Raynolds and John T. Gibson, Tulsa, for defendant in error.

JOHNSON, Justice.

The Thomas and Duffield Drilling Company, a corporation, hereafter referred to as plaintiff, filed this action against the defendant Russell Cobb, Jr. to recover on drilling agreements in connection with the drilling of two oil wells in Schleicher County, Texas.

The defendant was the owner of the leases involved, and the plaintiff was a drilling contractor. The facts are not in dispute. The controversy arises by the different interpretations of the facts and the conclusions drawn therefrom.

The two wells which were involved were designated the Jackson #1 and the Jackson #1-A. That the contracts were fully performed in connection with #1-A is admitted. So, though there may be some dispute over the accounting features, there is no disagreement about the complete performance of the contracts concerning #1-A. We are therefore principally concerned with #1.

The undisputed facts as shown by the record establish the following. It was agreed by the plaintiff that the well would be drilled to a "maximum depth of 5800 feet below surface or to adequately test Strawn Limestone." The well was drilled 5701 feet, which was into the Strawn Limestone a depth of 87 feet. At this point a conference was held by all interested parties in Tulsa, Oklahoma, the defendant being present, and it was agreed to set casing and test the well. The defendant ordered and furnished the casing as provided by contract. After this was done, many tests of various kinds were had, and it was determined that a commercial well could not be had, and the well was plugged. The second well had been commenced and completed and no controversy arose concerning the work performed in this well. The consideration expressed in the drilling contract for Jackson #1 was that the driller was to stand ⅛ of all the expense of drilling, which was set at $4.00 per foot. There were also provisions concerning the furnishing of the derrick, fuel, etc.

When the well was abandoned, the driller demanded payment of the balance due, which was not paid. Under a dry hole letter from Humble Oil Company, which owned a small interest, their share was paid.

After this suit was brought, it was contended for the first time that the Strawn Limestone had not been adequately tested, and therefore plaintiff was not entitled to recover. The trial court so held. This appeal follows.

The following facts are without dispute in the record:

1. Full reports on every phase of the drilling were furnished to Cobb throughout the work.

2. The work was performed in a workmanlike manner in every particular as far as it went.

3. The sole objection urged is that the Strawn Limestone was not "adequately tested."

Upon this phase the evidence was conflicting in the expert opinion evidence in the record. However, we have concluded that this testimony is not controlling in this case for the reasons hereafter set out.

■ It will be observed that the contract was in the alternative that the well must be drilled to a depth of 5800 feet *or* a sufficient depth to adequately test the Strawn Limestone. After a depth of 5701 feet had been reached, a conference of all the interested parties was held. The defendant, Cobb, was present at this conference and in his testimony stated that he had been in the oil business since about 1950 and had handled about 160 wells since 1954. Despite all of this experience, he testified concerning the Tulsa meeting as follows:

"Q. In other words, they make the decision as to whether or not the pipe should be set on the well and things of that nature?

"A. That's right. If they think it is good and is in an area I know absolutely nothing about, I would have to rely on them. I wouldn't know.

"Q. In other words, you contend they had a right to make the decision on setting the pipe?

"A. I didn't say that but when they call you up and tell you they want to run pipe, you just say, fine.

"Q. Did you agree with them in this case?

"A. They called me and said it looked like they had a good well, and they wanted to run pipe—

"Q. Just answer the question. Did you agree with them, that's all I asked you.

"A. I said, what do you think? And they said, it looks like we have a good well, and I think we ought to run pipe and I said, O.K. *I agreed.* (Emphasis ours.)

"Q. Did you consult any outside source in this matter?

"A. No.

"Q. Do you have an outside geologist in your office?

"A. No.

"Q. They are available, are they not?

"A. If you want to pay them.

"Q. You weren't willing to pay a geologist to check the well, in other words?

"A. No. I was going on the word of the operator and Bert Smith.

"Q. You were not denied the opportunity to independently examine the materials furnished to you, were you?

"A. No, I wasn't.

"Q. You weren't denied the opportunity to have people, good men experienced in the field go examine those, were you?

"A. No, sir.

"Q. I am assuming when you relied on their opinion, you were willing to rely on their word, you weren't forced—

"A. They didn't give me a hammer lock or anything, I will say that, right.

"Q. As a matter of fact, as a matter of setting the pipe, you yourself ordered the pipe, did you not?

"A. At their request.

"Q. Well, somebody had to order it, isn't that correct?

"A. The setting was made, I will tell you that way.

"Q. All right.

"A. Frankly too they were at the end of their rope materialwise, and could I handle the pipe.

"Q. Under the contract, who was to be in charge of the cost, of the cost of the pipe?

"A. They were supposed to furnish the pipe—

"Q. Were you familiar with the Rotary Drilling Contract executed in this case?

"A. Well, I saw it. I hadn't read it.

"Q. It says the Owner shall furnish at his expense all casing and—

"A. It might be there. It might say that."

The above evidence establishes conclusively that Cobb agreed to the setting of the pipe.

Cobb was satisfied that an adequate test was being made. Never until this lawsuit was filed did he make any contention that adequate testing had not been made. Never did he make any demand that further drilling be had.

Why then did he agree to set pipe and proceed to furnish the pipe himself. He says: "No, I was going on the word of the operator and Bert Smith." In his conversation delineated above he continually refers to "they" without specifying who "they" are. No one of the employees of plaintiff was a geologist. The service performed by the operator consisted of drilling and furnishing complete reports of progress, all of which was admittedly well done. Who then is Bert Smith. He is not and has never been an employee of the plaintiff. He is a graduate geologist who "sat" on the well from the beginning. He was the person who brought the "deal" to Cobb and who had a personal interest in same, for Cobb had agreed to carry his company for an interest. He tried to communicate with Cobb every day. He evaluated the tests and samples, and it was upon him that Cobb relied. It was the opinion of

this witness upon whom Cobb relied that the Strawn Limestone was adequately tested.

No other conclusion can be reached from the evidence of Mr. Cobb that he agreed that an adequate test had been made, not upon representations of the plaintiff's employees, but upon the geologic opinion of Mr. Bert Smith.

It therefore follows that drilling having been stopped after Mr. Cobb had indicated his satisfaction with the test that he is now estopped to deny his liability. We are confirmed in this position by the fact that one of the major oil companies, Humble, also concurred in the conclusion that an adequate test had been made and voluntarily paid its dry hole liability.

In Summers on Oil and Gas, Sec. 685 at page 178, an excerpt from the text reads:

"* * * Likewise, if drilling is stopped and the owner accepts the well, he cannot complain if the driller does not drill further. * * *"

This statement is in line with the tenets of contract law generally. This rule is expressed in 17A C.J.S. Contracts § 514(2)d, page 847 in the text as follows:

"Except as to defects that are not apparent, an acceptance of waiver by the owner precludes him from refusing to pay a reasonable value for the work performed and the materials furnished, or from refusing to pay under the terms of the contract. * * *"

Again, in 12 Am.Jur., Contracts, Sec. 355, page 921, the first sentence of the section reads:

"The performance of conditions or of promises is dispensed with when the performance thereof is waived by acceptance of performance differing from the performance required by the contract. * * *"

Neither our own research herein nor the briefs have provided any cases directly in point. However, by analogy, we believe the following to be persuasive.

In the case of Texas Gulf Coast Land & Oil Co. v. Galveston-Chicago Well Boring & Drilling Co., 34 Tex.Civ.App., 77 S.W. 974, the syllabus reads:

"An oil company had a manager in charge of the sinking of a well, who insisted on its being bailed after it had reached full depth without striking oil, and who knew that the casing had not been completed. He reported the well's condition to the company, which thereafter, and after protest to the diggers, paid a sum to them on account, and also sold them the pipe intended for casing, receiving credit therefor on the account. Held, that the company had waived the bailing and casing of the well."

To our minds there is sufficient similarity between the cash payment mentioned above and the furnishing of casing in the instant case to sustain the analogy.

In the Oklahoma case of Pace v. Penny, 194 Okl. 135, 147 P.2d 991, a broker had contracted to assemble a block of oil leases. The defendant refused to pay and urged defects in the titles. Plaintiff urged acceptance of the leases as a waiver of the title requirements. The court sustained a judgment for plaintiff and in the course of the opinion said:

"* * * we believe there is such a close relation between acceptance and waiver in this type of cases that where the performance is accepted, though it is different from that agreed to, it is in effect a waiver of strict compliance. * * *"

The instant case is much stronger than the cases cited. Here the defendant was furnished with complete daily reports of the progress of the well. He was an experienced oil man, having handled about 160 "deals" in the past. He was present at the conference where Bert Smith, a geologist not connected with plaintiff, was present and upon whom he relied. Acting upon the facts presented, he agreed to the setting of casing, which he furnished and paid for. There is no proof of misrepre-

sentation in the daily reports. Under these undisputed facts, we hold that there was an acceptance of the well as being an adequate test of the Strawn Limestone. This is confirmed by the facts that the second well was drilled, and by the further fact of no contention of inadequate testing until the filing of the answer in this lawsuit.

Since we are holding the drilling contract valid, the accounting due must be had under the contract as it is to be entered hereunder.

Reversed with directions to hold an accounting under the judgment entered in conformity to this opinion.

BLACKBIRD, C. J., HALLEY, V. C. J., and WILLIAMS, JACKSON, IRWIN and BERRY, JJ., concur.