**FOLEY COMPANY, Respondent,**

v.

**L.G. BARCUS & SONS, INC., and Armco Steel Corporation, Appellants.**

**No. WD 33461.**

Missouri Court of Appeals,
Western District.

Sept. 20, 1983.

Motion For Rehearing and/or Transfer to Supreme Court Overruled and Denied Nov. 15, 1983.

Application to Transfer Denied
Dec. 20, 1983.

John L. Hayob, Kansas City, for appellants.

Kevin E. Glynn, Kansas City, for respondent.

Before DIXON, P.J., and KENNEDY and LOWENSTEIN, JJ.

KENNEDY, Judge.

L.G. Barcus & Sons, Inc., defendant and appellant, had a contract to construct a railroad tunnel for Armco Steel Corporation. Barcus subcontracted to Foley Company, plaintiff and respondent, a part of the project, to install discharge lines and pumps which would carry water from underneath the tunnel over a levee. The drainage water would collect in a concrete pump pit, or pump station, and from there would be pumped over the levee.

When Foley had completed the work under its subcontract, and before its acceptance by owner Armco and general contractor Barcus, a test showed that the lines were leaking water. A dispute arose between Barcus and Foley as to which of them was responsible for repairing the faulty line. Foley denied responsibility. Barcus proceeded to repair the line at a cost of $13,601.04. Foley brings this action to recover from Barcus the sum of $9,953.59 retained by Barcus under the terms of their contract pending satisfactory completion of the work. Barcus claims it is entitled to retain the amount of retainage, and brings a counterclaim against Foley for the balance of its cost of repair, $3,647.45.

The replacement of the broken joint involved a great deal of excavation to reach the joint; cutting out the broken fitting; replacing and refitting the same; and backfilling the excavation. There is no claim that the cost claimed by Barcus was excessive, nor is there any claim by either party that the cost of repair should be apportioned between them in any way. The case has proceeded on the assumption that Foley should pay all the cost or none of it.

The trial court found for Foley on all counts, both on the claim and the counterclaim, and rendered judgment for Foley on its claim against Barcus for the $9,953.59 retainage, and also found for Foley on Barcus's counterclaim.

It was the trial judge's task, now ours, to apply to the facts the subcontract between the parties.

The facts are not in dispute.

Foley began work under its subcontract in April of 1979. Its subcontract required excavation of a considerable amount of dirt. The discharge pipes were to be laid 10 to 15 feet below the surface of the ground and it was Foley's duty to excavate the overlay. The pipes were of cast iron. Two of them, including the one in which the break occurred, were 20 inches in diameter. The third was 8 inches in diameter. In accordance with the contract terms, the pipes were furnished to Foley by Barcus.

After the pipe was laid and covered with a foot or two of fill dirt, it was tested by the injection of air and was found to be airtight. This test was conducted June 25, 1979. The excavation was then backfilled to a depth of 10 to 15 feet. It was Foley who did this backfilling. At the point where the leak was later discovered, near the pump station, the overlay of earth was left at that depth, although it was graded up from there, during the year between the Foley backfill and Foley's return to install the pumps, at a steep incline an additional 10 or 12 feet. The additional fill was put in place by another subcontractor of Barcus, and not by Foley.

Almost a year passed after the interim test and the backfill, when Foley returned for the final part of its job, which was to install pumps inside the pump station. This was done on May 28 or May 29, 1980. The pumps were turned on and water was pumped into the pipes. Water began to bubble up through the ground at a point directly outside the pump station.

The cause of the leak proved to be a break in a cast iron fitting in the pipe at a joint immediately outside the pumphouse wall. Engineer Browne testifying as an expert gave it as his opinion that the cause of the break might be caused by failure to tighten the 15 to 18 bolts connecting the joint at an equal pressure, creating an extraordinary strain on the pipe, or, as a second possibility, an "extremely heavy" load that the pipe had been subjected to from above. He could not choose between the two possible causes.

*Contract as placing upon subcontractor risk of loss from undetermined cause.*

■ Appellant Barcus's position is stated in his brief as follows: "... (T)he subcontract places the risk of loss for any damage to the work ... until acceptance by the owner ..." It would not be unfair to characterize its position as being that the subcontractor was to deliver a finished product which complied with the contract specifications.

Foley on the other hand claims that it performed all its obligations in a workmanlike manner and that it is not responsible for damage to the pipe from some undetermined cause.

The "leak test" to which the pipe was subjected on June 25, 1979, was a test required by the general contract between owner Armco and general contractor Barcus. It was conducted with approximately two feet of dirt over the pipes, and before the excavation was completely backfilled.

Mr. Kaul, an engineer in Armco's employ, explained:

Q. And why was this test done at that time?

A. Well, the next step after this was to backfill the line and bury it eight to ten feet deep; and if there was a leak ·to appear, why this was the time to make any necessary repairs, before we went ahead with the backfill ...

Q. Now, did that test, that static pressure test, as far as Armco was concerned, have anything to do with the acceptance of the work, or any portion of it?

A. Not really. It said to us that, "Okay. The pipe appears to be—well, it will not leak beyond the acceptable amount and we can proceed with the next step in construction."

Q. And when was it that Foley, as best you can recall, after the test was performed and they did whatever backfill that they did, what was the next thing that you can recall that they did, Foley?

A. At the pump station, they did nothing else until about, I believe it was about May of 1980, the tunnel was basically

complete at that time and they came in to install the pumps, install the pumps that come up through the discharge pipe.

Here is a case where it cannot be determined whose is the *fault* for the cracked pipe. The contractor and the subcontractor tacitly agree that one of them must bear the responsibility and the loss occasioned by the broken and leaking pipe.

The parties foresaw such an eventuality as this. They undertook to provide for a case in which there would be a loss which could not be accounted for by the fault of either party. They did provide for such an eventuality by language which seems to be clear. Paragraph 15 of the subcontract reads as follows.

RESPONSIBILITY FOR WORK: Subcontractor shall be responsible for all materials and equipment delivered and work performed hereunder until completion and final acceptance of the work, and upon completion of the Subcontract the work shall be delivered complete and undamaged...

Paragraph 17 carries out the same theme. It reads in part as follows:

17. COMPENSATION AND PAYMENTS: (a) Subcontractor agrees to accept the specified compensation as full compensation for doing all work and furnishing all equipment and materials and workmanship called for and specified in this Subcontract; for all loss or damage arising out of the nature of the work or from the action of the elements or from any unforeseen or unknown difficulties or obstructions which may arise or be encountered in the prosecution of the work until its acceptance; and for all risks of every description connected with the work; and for the performance by Subcontractor of all of its duties and obligations hereunder.

This language we believe clearly and unambiguously places upon Foley the responsibility for the repair and replacement of the damaged pipe.

The parties tell us that they have been unable to find any Missouri cases which are analogous to the present one, but Barcus cites us to *Lincoln Welding Works, Inc. v. Ramirez*, 647 P.2d 381 (Nev.1982), which is helpful. In that case it was the subcontractor's work to drive sheet piling at a construction site. It completed its subcontract work but before the entire project was completed and accepted by the owner, a flood occurred which caused extensive damage to some of the work performed by the subcontractor. The subcontractor repaired the flood damage and sought payment from the prime contractor. The court held that the risk of loss was upon the subcontractor rather than upon the prime contractor. We quote at some length from the court's opinion in that case:

A review of the pertinent provision of the subcontract, reflects that the risk of loss was to remain with the appellant until formal acceptance of the project by the Sanitation District. According to subsection two of the subcontract, appellant agreed "to do all work in a first-class and workmanlike manner and to the entire satisfaction of the owner, contractor, and architect." Subsection five of the agreement goes on to state, "to take proper care of all building materials on the ground." Additionally, section nine of the subcontract states, "Sub-Contractor hereby releases Rico Paving & Grading Co. of all liability on account of any accidents during performance of work in this contract." The final clause of the parties' agreement states, "the final payment of which the said Contractor will pay to the said Sub-Contractor, 30 days after final payment by owner provided the Sub-Contractor shall have completed his work to the full satisfaction of said contractor, owner and architect."

Generally, "one who contracts unqualifiedly to erect a structure for a stipulated price enters into an entire contract to complete such work and must bear the losses resulting from its accidental destruction or damage before completion, unless the contract stipulates that he will not be responsible for losses occurring in such manner." *Mainland v. Alfred Brown Co.*, 85 Nev. 654, 461 P.2d 862

(1969); *Collins v. Post,* 227 Or. 299, 362 P.2d 325 (1961).

In the instant case, the subcontract, considered in its totality, suggests that the parties bargained with reference to the prime contract and with the expectation that appellant would bear the risk of loss to its work, until formal acceptance by the District. Additionally, the subcontract does not contain a risk shifting provision absolving appellant from bearing the risk of loss until the contract was completed to the satisfaction of the owner and architect. 647 P.2d at 384.

In *Collins v. Post,* 227 Or. 299, 362 P.2d 325 (1961), cited in Lincoln Welding, the subcontractor had subcontracted for the construction of a tunnel carrying a steam line. After the completion of its work, and before the final acceptance of the project by the owner, the tunnel was damaged through the negligence of parties other than the subcontractor or the prime contractor. Noted the court: "We are not required to make a determination of who was responsible for the damage, but it will tend to clarify our statement to observe that it was apparently caused by another contractor or his subcontractors." 362 P.2d at 326.

The subcontractor repaired the damage and brought an action against the contractor for the payment of its cost of repair. The court held that it was the subcontractor who bore the risk of loss. Wrote the court:

The general rule is that one who contracts absolutely and unqualifiedly to erect a structure for a stipulated price enters into an entire contract to complete such work and must bear the losses resulting from its accidental destruction or damage before completion. The underlying theory is that destruction or damage of the subject matter is no legal justification for nonperformance of the contract unless the contract stipulates that he will not be responsible for losses occurring in such manner. Such a contractual immunity is not present here. 17A C.J.S. Contracts Sec. 466b, p. 961; 9 Am.Jur. 43, Building and Construction Contracts Sec.

60; Annotation, 53 A.L.R. 105, 109. See, also, *Savage v. Glenn,* 10 Or. 440.

These cases are persuasive and we adopt their reasoning to hold that Foley is responsible under its contract for the replacement of the pipe.

*Effect of interim test results.*

■ Subcontractor Foley emphasizes two features of the case. First is the "air test" which was made after the pipes were connected and which showed that the pipes at that point in time were leak proof. As the witness explained, this was an interim test, the purpose of which was to reveal leaks before the pipes were buried several feet before the surface. It may be pointed out that this test was as much or more for the subcontractor's benefit as for the benefit of the owner or the contractor. The biggest portion of the work and expense involved in this project was the excavation and the backfill, and this test was intended to reveal flaws before the work was covered up. It was in Foley's interest to have the work tested at this point. The owner and the contractor were actually interested only in the results upon the final inspection.

The air test was a "static" test and did not duplicate actual use conditions. The final test consisted of pumping water through the pipe at a rate of 7,000 gallons per minute, which would subject the pipes to different stresses than the static test.

It is clear that the air test was only an interim test. The subcontract is very clear on the effect of the interim test. An interim test might fail to reveal some flaw—or some flaw might develop, or appear, after the interim test and before the final inspection and acceptance by the owner. That was the case here. The contract provides for that eventuality, paragraph 6, in these terms:

6. INSPECTION AND REJECTION OF EQUIPMENT, MATERIALS, AND WORKMANSHIP; (a) All equipment and materials furnished and workmanship performed by Subcontractor shall be subject to final inspection, tests and acceptance by Contractor and Owner upon completion of all Subcontract work. At

any and all times during manufacture or performance of the work, all equipment and materials furnished and workmanship performed by Subcontractor shall be subject to inspection, tests and approval by inspectors of the Contractor, and Owner, at any and all places where such manufacture or performance may be carried on. Failure of such inspectors to make inspection or tests, or to discover defective material or workmanship shall not prejudice the rights of Contractor or Owner on final inspection and tests....

*Effect of contractor's duty to furnish pipe.*

■ Subcontractor Foley further says that the break was in the pipe, which was furnished by Barcus. Since the break was in the pipe, Foley argues, and the pipe was furnished by Barcus, the entire responsibility for the repair ought to be upon Barcus and none upon Foley. It is a complete answer to that argument that Foley does not allege in any of its pleadings that the broken pipe was defective when furnished and installed, nor is there any suggestion in the evidence to that effect.

*Claim of inadequate support as cause of break.*

Foley also suggests that the cause of the failure was the inadequate support under the pipe (crushed rock), called for by the specifications. This also is speculation and is based altogether on the fact that Barcus, when it repaired the pipe, supported it with poured concrete.

The judgment of the trial court is reversed, and the cause is remanded for the entry of a new judgment for Barcus upon plaintiff's petition and upon Barcus' counterclaim.

All concur.