**HAVENS STEEL COMPANY, Plaintiff,**

v.

**RANDOLPH ENGINEERING COMPANY, et al.,**
**Defendants.**

No. 80–0898–CV–W–0.

United States District Court,
W.D. Missouri, W.D.

May 7, 1985.

516

Kevin E. Glynn, Kansas City, Mo., for plaintiff.

Paul L. Waldron, Washington, D.C., Thomas J. Wheatley, Daniel M. Dibble, Karen Iverson, Kansas City, Mo., for defendants.

## MEMORANDUM OPINION AND JUDGMENT

ROSS T. ROBERTS, District Judge.

Plaintiff Havens Steel Company ("Havens") seeks damages allegedly incurred as the result of defective or deviate work performed under a construction subcontract between it and defendant Randolph Engineering Company ("Randolph"). Randolph counterclaims for various damages it believes it suffered by reason of job interference, work delays and uncompensated extra work. Jurisdiction is based upon diversity of citizenship.

The matter has been tried to the court. For the reasons which follow I render judgment in Randolph's favor on both claims, the amount thereof with respect to its counterclaim being in the sum of $364,-790.93, exclusive of the pre-judgment interest allowed on its claim under Count VII.

## I.

## GENERAL BACKGROUND

Havens is a Missouri corporation having its principal place of business in Kansas City, Missouri. Randolph is a Pennsylvania corporation with its principal place of business in Pittsburgh, Pennsylvania.

The dispute between the parties concerns a large cement plant located in Charlevoix, Michigan, owned by Medusa Cement Company ("Medusa"). Prior to the year 1979, that plant had produced cement by means of a "wet" manufacturing process. For various reasons Medusa decided to convert the plant to a "dry" system of production and in that connection, sometime in the year 1978, employed Kaiser Engineers of Michigan ("Kaiser") to design and supervise construction of the necessary facilities. The project involved at least 25–30 "prime" contracts, many more subcontracts, and a total cost in excess of $50,000,000.

One of the contracts related to the fabrication and erection of an "electrostatic precipitator"—work which was ultimately the subject of a subcontract between American Air Filter Company ("AAF") (the prime contractor for that segment of the project) and Randolph, under which Randolph was responsible for erection of the precipitator. This subcontract is important here only insofar as reference to it is necessary in dealing with the dispute between Randolph and Havens, which concerns another part of the project.

The part of the project which actually gives rise to the present claims involved the fabrication, insulation and erection of the ductwork necessary to the plant conversion. That ductwork was composed of pieces of ¼ inch carbon steel duct, most of which were 10 to 12 feet in diameter and weighed hundreds of tons, with some rising to a height in excess of 180 feet when fully erected. Havens was to fabricate those pieces of duct (uninsulated), deliver them to the site, and act as the prime contractor in connection with their insulation and erection. The actual erection effort, however, was carried out by Randolph, with the insulation work being performed by Mechanical Insulation Services, Inc. ("M.I.S.") under a subcontract between it and Randolph.

In essence, Havens claims that Randolph and M.I.S. deviated from contract specifications in applying the "cladding" (the exterior metal sheath—also called "lagging" or "jacketing"—which covered the insulation) to the ductwork, which in turn ultimately necessitated the repair or replacement of much of that cladding and the underlying insulation. The cost incurred in that repair and replacement is said to have been $499,479.91, toward which Havens alleges it paid the sum of $192,799.69. The claims for the remainder of that $499,479.91 are not in issue here.[1]

For its part, Randolph asserts that Havens was approximately four months late in delivering the pieces of fabricated ductwork to the site, with a consequent delay in Randolph's ability to begin insulation and erection of the ductwork. Because of that delay, Randolph claims, the buildings on the site were in a far more advanced stage of construction than would otherwise have been the case, all of which led to difficulties and delay in the performance of its work, with associated costs and expenses. In addition, Randolph asserts it was caused to perform extra work, outside its contract requirements, by reason of certain defective materials furnished by Havens or Medusa or both. For all its various sorts of

---

1. Before trial, Havens, Kaiser and Medusa entered into a settlement of the various claims each had asserted against the other in connection with the project. In concluding that settlement, Havens took an assignment of any claims Medusa and Kaiser might have against Randolph for the remainder of the cost of cladding and insulation repair and replacement. Havens did not, however, seek to amend its complaint to assert those assigned claims, and Randolph objected to any attempt to determine them without benefit of such a pleading. That objection was sustained, although Havens was advised that the court would allow the filing of an amended complaint at any point before trial was concluded, and would further allow Havens to anticipate the matter by putting in its proof on those assigned claims. Despite this, no amended complaint was ever put forward, either during trial or at any time thereafter.

alleged damage Randolph seeks an amount of $464,303.06, together with prejudgment interest on one claim and its "cost of capital" (calculated at 15% per annum) on the others.

## II.

### THE CONTRACT

A central issue, touching both the original claim and the counterclaim, is whether an actual contract between Havens and Randolph was ever achieved, and if so what its terms may have been.

The issue is made particularly difficult by reason of the method of proof employed. In contrast to the situation usually encountered with this sort of question, here neither party offered any step-by-step explanation of their negotiations, or even any general overview of their course of dealing. *Compare,* e.g., *United States ex rel. United States Steel Corporation v. Construction Aggregates Corporation,* 559 F.Supp. 414 (E.D.Mich.1983), *aff'd in part, rev'd in part* (without opinion) 738 F.2d 440 (6th Cir.1984). Instead, the record is limited to scattered pieces of documentary evidence, largely unaided by the explanatory or unifying testimony of any witness. The result, while allowing the court to rule the point, leaves one with a distinct feeling of having dealt with matters in a vacuum.

In sequential form, the available evidence reflects the following:

(a) On September 25, 1978, Randolph sent two letters to Havens. The longer of these (Def.Ex. # 24, offered by plaintiff) undertook to "confirm" Randolph's prices for erection and installation of the ductwork and related items ($392,535 for erection, $335,280 for insulation); made reference to an earlier letter (not included in the record) in which the above prices were "broken down and transmitted" to Havens; and continued on to note certain "clarifica-

tions" to the "specifications" which had been "discussed previously." The shorter letter (Def. Ex. # 184, first page) simply "confirmed," again, the prices quoted above. There is no other information concerning the parties' discussions prior to September 25, 1978, or indicating what precise point those discussions had reached as of that date. Neither is it entirely clear what information and documents Randolph had in hand as of that point in time.[2]

(b) On October 18, 1978, Randolph directed another letter to Havens (Def.Ex. # 184, second page), referencing a "previous telephone conversation" and confirming a reduction of $15,000 in the overall price stated in Randolph's letters of September 25.

(c) On October 23, 1978, Havens executed a formal contract with Medusa in connection with the project. By the terms of that contract Havens was to be responsible for the fabrication, delivery, erection and insulation of the ductwork specified in the contract. *See* Plt.Ex. # 1 (the contract); Plt.Ex. # 2 (a "change order" to the contract, also dated October 23, 1978); and Plt.Ex. # 3 (pp. 15–37 and 40–89, both inclusive). There is no information as to the time frame or nature of the negotiations which preceded this contract.

(d) On November 2, 1978, Randolph directed another letter to Havens (Def.Ex. # 184, third page). In that letter Randolph acknowledged

> receipt and acceptance of your letter of intent dated October 27, 1978, and for your purchase of our firm for the erection and installation, complete per plans and specifications dated August 8, 1978, addendum number 1 dated September 27, 1978, and our pricing and qualification letters dated September 25, 1978 and October 18, 1978.

Unfortunately, Havens' "letter of intent" is not a part of the record, and I have not the

---

**2.** For example, while it is obvious that Randolph then had access to the work specifications (*see* pages 16–37 and 40–46, both inclusive, of Plt.Ex. # 3) and shop drawings prepared by Kaiser for the ductwork, it is uncertain—sufficiently so to prevent any affirmative finding on the

point—whether it had seen any "general terms and conditions" proposed for inclusion in contracts between Medusa or Kaiser and potential "prime" contractors such as Havens. *See* items (e) and (h), *infra.*

least idea what its terms might have been. Neither does the record reflect what the parties' discussions or negotiations in connection with it might have been. Randolph's letter does, however, reflect a further revision in the total price for the work, to $715,575.

(e) At some point or points between November 2, 1978 and November 29, 1978, there were one or more telephone conversations between Havens' and Randolph's respective project managers. In those conversations Randolph was asked to state the "exceptions" it wished to take to the general terms and conditions "of the contract ... in the Kaiser documents." This citation to the "Kaiser documents" is not entirely clear, but was apparently a reference to the prime contract between Kaiser and AAF for the AAF phase of the project (*see* item (h), below). Since Havens was never directly involved in the AAF phase of the project, however, it is obvious that the parties' remarks with respect to "exceptions" were not meant to apply to the AAF contract itself or to any contract between AAF and Randolph,[3] and instead address a concern that similar provisions might be included in Havens' contract with Medusa and in turn be included in whatever "general terms and conditions" Havens might propose to Randolph.

(f) On November 20, 1978, Randolph submitted to Havens a schedule for erection of the ductwork (March 19, 1979 to August 1, 1979) (*see* Def.Ex. # 20). On November 22, 1979 Havens forwarded, for Randolph's "review and concurrence as a result of the Randolph letter of 11/20/78," dates for shipment of the ductwork (extending from March 5, 1979 to June 4, 1979) (Def.Ex. # 189, third page).

(g) On November 29, 1978, Randolph again communicated with Havens by letter (Def.Ex. # 189). That letter enclosed another schedule for ductwork erection, revised to meet Havens' earlier expressed concern over delivery time for the "stack." The schedule was otherwise the same as provided for in Randolph's November 20 communication. On the margin of the letter, Havens' Vice President noted that "Randolph and Havens are in basic accord on the schedule."

(h) Randolph's letter of November 29 also made reference to the "general terms and conditions" of the proposed formal contract between AAF and Kaiser, together with AAF's "exceptions" thereto,[4] and proceeded to set forth certain changes Randolph itself would like. The most important of these (for present purposes) would have insured Randolph's ability to recover additional compensation for construction delays caused by the owner or other contractors at the site. According to Randolph's project manager (Gene Vogan), this latter portion of Randolph's letter was in response to the parties' earlier telephone conversations on the subject (*see* item (e), above).

(i) Randolph heard nothing further from Havens on the subject of "general terms and conditions" until receipt of Havens' formal "purchase order" in May of 1979.

(j) Randolph placed men and equipment on site for work under its AAF subcontract, and in fact began working under that subcontract, sometime in January, 1979.

(k) On January 24, 1979 Randolph transmitted to Havens another schedule for ductwork delivery and erection (Def.Ex. # 1062). The dates in that schedule duplicate those set forth in Randolph's earlier schedule of November 29, 1978. The reason for submission of this schedule was simply to utilize a format desired by Kaiser.

(*l*) On February 7, 1979, Randolph forwarded a proposed formal contract to M.I.S. for the latter's work as a subcontractor under Randolph "at [sic] Havens

---

**3.** The record is silent with respect to the status, at that time, of the negotiations between AAF and Randolph concerning the subcontract between the two which was in fact ultimately entered into.

**4.** What these may have been is unknown.

Steel Company, Charlevoix, Michigan" (Def.Ex. # 273, offered by plaintiff).[5] The document refers to "[i]nsulation complete per plans and specification 77118–212 dated August 8, 1978 and Addendum No. 1 dated September 27, 1978, as well as to "Terms & Conditions of the prime contract (copy enclosed—38 pages)." Although the exhibit in the record does not contain that "prime contract," it seems clear that the reference is to Havens' contract with Medusa, thus demonstrating that Randolph was by then in possession of *that* document. Also incorporated are four printed pages of "General Terms And Conditions." These pages, however, were rather clearly originated by Randolph—as opposed to being derived from any "general terms and conditions" proposed by Havens—since the "Venue" section specifies that any action under the contract shall be brought in Allegheny County, Pennsylvania, a location which had no relationship to any of the participants in the project except Randolph. Additionally, a performance schedule was included. Although that schedule is not a part of the instant record, it appears to have been based upon the November 29, 1978 schedule sent by Randolph to Havens (*see* Plt.Ex. # 8, fifth page). The contract was executed by both Randolph and M.I.S. sometime during February, 1979.

(m) March 5, 1979—the date for the first delivery of ductwork by Havens—came and passed without delivery of any ductwork. Havens communicated with Randolph periodically between that time and May, 1979, assuring Randolph that delivery would begin shortly. On May 8, Randolph provided a fourth schedule, based on then-current information from Havens, reflecting an erection period extending from May 21, 1979 to October 1, 1979. Randolph continued to use its men and equipment on the AAF phase of the project, which itself had begun experiencing delays.

(n) In a communication dated March 22, 1979 but not received by Randolph until approximately May 9, 1979,[6] Havens presented a "Purchase Order" for Randolph's services (Plt.Ex. # 4). That document was in all respects a formal, integrated written contract proposal, stating the scope and price of the work and incorporating by reference the work specifications, the contract between Havens and Medusa, the contract bid drawings and other operative documents. Included by virtue of these incorporations were two sets of "General Terms and Conditions," one being "Exhibit C" to the specifications and the other being incorporated in the prime contract between Havens and Medusa. Also included were two printed pages of "Terms & Conditions Applying to Subcontractors And/Or Suppliers," and 12 separately typed "special conditions." Among those "special conditions" was No. 6, which specified:

> 6. *Delays in Transportation*
>
> Delays caused by factors beyond the reasonable control of Havens Steel Company will not be the basis for backcharges or delay costs unless they are recoverable from the source causing the delay. Havens will advise you of shipment schedules to the best of our ability.

At the conclusion of the eight-page document a space was provided for signature by a Randolph officer, under the legend "ACCEPTED," all of which was immediately preceded by the words,

> RANDOLPH ENGINEERING COMPANY Hereby indicates its satisfaction with all provision [sic], terms and conditions of the purchase order and hereby accepts the same as acknowledged by the signature of its authorized agent in the space below:

Randolph had never before seen either the "Terms & Conditions Applying To Subcontractors And/Or Suppliers" or the 12 "Spe-

---

5. The record is silent as to the discussions between Randolph and M.I.S. which preceded this submission.

6. The reason for the delay is unexplained, but the logical inference is that Havens did not transmit the document until shortly before May 9.

cial Conditions," nor had the parties ever discussed them except to the extent that their earlier communications dealt with a provision covering delay damages.[7] In addition, the "purchase order" undertook to specify a "tentative start of erection ... in April 1979 with erection to be completed in August, 1979," and further provided that "[a] detailed schedule will be incorporated ... as soon as it can be developed."[8]

(*o*) On May 9, 1979, Randolph responded to the "Purchase Order" by executing it in the space provided, *and* by adding immediately after the word "ACCEPTED" the words "See Randolph letter of 9 May 1979." That letter (Plt.Ex. #5)—attached to the purchase order when it was returned to Havens—recited that the purchase order was "executed and accepted under the following conditions." Among those conditions was a statement that Randolph's November 29, 1978 performance schedule would govern, together with a paragraph calling for the deletion of paragraph 6 of the Special Conditions (quoted above) as well as all other provisions in the incorporated documents related to "No Damages for Delay," and the substitution of language which would provide that if the work was delayed or postponed for any cause except that relating entirely to Randolph's fault or negligence, Randolph would be reimbursed for all resulting added costs. The letter concluded by requesting Havens' approval and provided a space therefor.

(p) Havens responded by letter dated May 16, 1979 (Def.Ex. # 194). The most important part of that letter reads as follows:

> After you make the site visit you mentioned [the parties had communicated by

telephone on May 15, 1979, but there was no testimony as to the content or result of the conversation], I think we need to talk over this whole matter and try to determine just what delay factors you may be anticipating, the cost therefor and whether or not they could be attributable to Kaiser's involvement with revisions and delays and approvals.

(q) The record does not reflect any further communication by Havens on the matter. Havens' deliveries of ductwork commenced in June of 1979, with concentrated deliveries in July. Both parties thereafter completed their respective performances. During the months of July, September and October, 1979, while work was still ongoing, Randolph communicated with Havens or Kaiser on a number of occasions (Def.Ex. # 18; Plt.Ex. # 33; Def.Ex. # 20; Def.Ex. # 23; Def.Ex. # 25; Def.Ex. # 36), stating its intent to make claim for damages from delay, and in October (with work still ongoing) submitted those claims to Havens (Plt.Ex. # 7, Plt.Ex. # 8).

\* \* \*

From the information just recited it seems clear that Havens and Randolph had, at some point before January, 1979, reached agreement with respect to the specific work to be done by Randolph, the scheduling thereof and the price to be paid therefor, with mutual manifestations of assent on *those* subjects.[9] That is *not* true, however, with respect to some of the more detailed or peripheral incidents of their relationship—specifically Havens' proposed "Terms & Conditions Applying To Subcontractors And/Or Suppliers" and 12 "Special Conditions," including the portions thereof dealing with delay damages.[10]

---

7. Vogan's testimony was that Randolph had never seen or discussed any "general terms and conditions" as proposed by Havens until the purchase order. I accept that testimony, and regard it as including both the 12 "special terms and conditions" and the "Terms & Conditions Applying To Subcontractors And/Or Suppliers."

8. Since the document was not received until May, with no preceding commencement of ductwork delivery, the effect was of course to move

the commencement of Randolph's performance back even further.

9. As noted in the *Restatement (Second) of Contracts* § 22(2) (1979), a manifestation of mutual assent may be found even though the precise moment thereof cannot be identified.

10. As mentioned, it is unclear whether Randolph had possession of *any* "general terms and conditions" prior to receiving those pertaining to Kaiser's contract with AAF, at which time it

**522**

■ The first question presented is whether an enforceable contract of any sort existed prior to May, 1979; *viz,* whether, having reached agreement upon the details, price and schedule of the work itself, the parties intended (objectively) to be bound at least to that extent, even though other aspects of their relationship were left to future negotiation, and if so whether the agreement reached could be fairly enforced without reference to those remaining terms. *See Restatement (Second) of Contracts, supra* § 33; 1 *Corbin On Contracts* § 29 (1963), and cases cited; 1 *Williston On Contracts* § 48 (3d ed. 1937), and cases cited. As a technical matter, at least in the circumstances here, I believe the question should be answered affirmatively. *Compare Mid-Continent Tel. Corp. v. Home Tel. Co.,* 319 F.Supp. 1176, 1188–95 (N.D.Miss.1970); *Air Technology Corp. v. General Elec. Co.,* 347 Mass. 613, 199 N.E.2d 538, 548 (1964); *Phillips & Easton Supply Co. v. Eleanor Int'l., Inc.,* 212 Kan. 730, 512 P.2d 379, 380 (Syllabus # 2, 3), 383–85 (1973); *Henry C. Beck Co. v. Arcrete, Inc.,* 515 S.W.2d 712, 716 (Tex.Civ.App.1974). Given the subsequent course of events regarding Havens' proposed formal purchase order, however, that finding becomes academic.

By undertaking to change the parties' performance schedules—a subject of material importance to Randolph [11]—as well as by including the 12 "Special Conditions" and the "Terms & Conditions Applying To Subcontractors And/Or Suppliers," Havens' formal purchase order represents an offer of a substituted contract. *See gener-*

*ally Twin River Const. Co. v. Public Water Dist.,* 653 S.W.2d 682, 690 (Mo.App. 1983); *Restatement (Second) of Contracts, supra* § 279; 6 *Corbin, supra* §§ 1293, 1296.[12] Randolph's May 9 response is clearly a counteroffer. *See Restatement (Second) of Contracts, supra* § 59; 1 *Corbin, supra* §§ 82, 89; 1 *Williston, supra* § 77. Havens' May 16 response is neither an acceptance, a rejection or a counteroffer; it is simply a request for further discussion, the effect of which was to leave Randolph's counteroffer pending. *See* 1 *Williston, supra* § 51 at 166–67, § 79 at 262–63, and cases cited. The question then becomes whether the lack of any further discussion, coupled with both parties' performance, can be taken as Havens' acceptance of that counteroffer.

■ There is no doubt that acceptance can be shown by the offeree's acts or conduct, *see Restatement (Second) of Contracts, supra* § 19, and more specifically can, in appropriate circumstances, be found simply in the offeree's performance or knowing acceptance of the offeror's performance, *see Moore v. Kuehn,* 602 S.W.2d 713, 718 (Mo.App.1980); 1 *Corbin, supra* §§ 62, 75, and cases cited; 1 *Williston, supra* § 78A, and cases cited.

If the parties' overall relationship here had commenced with Havens' formal contract proposal, I would have little difficulty applying that principle. The situation is complicated, however, by my belief that an enforceable contract relating to the work, albeit informal and lacking at least any agreement on a damages for delay provision or any other of Havens' subsequently

---

made known its desire that there be no clause excluding damages for delay in any contract pertaining to it. Havens made no response to that letter, and did not submit its own "Terms & Conditions Applying To Subcontractors And/Or Suppliers" and 12 "Special Conditions" until May, 1979, whereupon Randolph again rejected (among other things) a provision which would limit its right to claim additional compensation for delays. It is simply not possible in these circumstances to find a "mutual assent" by the parties to any provision regarding delay damages, or in fact to any of the other special terms proposed by Havens, prior to May, 1979.

11. Randolph had calculated its costs with the understanding it would have an approximate two month overlap on the AAF and Havens' phases of the project, during which time it could use some of the same men and equipment on both jobs with a resulting economy of time and effort. It had, of course, also entered into a contract with M.I.S. which provided for the latter's performance based upon the November 29, 1978 schedule.

12. Given the scheduling change and the reciprocal impact of the additions, there is no problem with consideration.

proposed special contract terms, had existed prior to May, 1979. In those circumstances the effect of the parties' performances, *vis a vis* Randolph's counteroffer, becomes more uncertain.

Despite this qualifying feature, an appropriate analysis of the facts dictates a finding that in light of Havens' equivocal response of May 16, its own subsequent performance (payment) and acceptance of Randolph's performance in fact represent an acceptance of Randolph's May 9 counteroffer. Neither party had begun performance as of May 9; indeed, Havens' failure to deliver the ductwork had already rendered performance in accordance with the original schedule impossible. That fact in turn gave particular significance to the question of compensation for additional work caused by delay, a point understood by Havens as its May 16 letter makes clear. What the parties' course of conduct might have been at that point had Havens clearly rejected Randolph's demand is unknown; but given the above circumstances, together with the fact that a damages for delay provision as well as the other proposed special provisions were clearly of significance to both parties, Havens' subsequent conduct must be viewed as a manifestation of its assent to Randolph's counteroffer—that is, as conduct creating the appearance of assent, in which Havens intended to engage and as to which Havens knew or had reason to know that Randolph might infer assent. *Compare Gateway Company, Inc. v. Charlotte Theatres, Inc.*, 297 F.2d 483, 485–86 (1st Cir.1961); *and see Restatement (Second) of Contracts, supra* § 19(2); 1 *Corbin, supra* § 74 at 314. The fact that Havens' actual, subjective intent might have been otherwise is immaterial, at least where (as here) it has raised no claim of mistake or other basis for avoidance. *Restatement (Second) of Contracts, supra* § 19, comment *d*, § 2, comment *b*.

I conclude that Havens' proposed contract of May, 1979, as modified by the terms of Randolph's letter of May 9, 1979, became a complete, substituted contract with reference to the ductwork project, defining the extent of the parties' rights and duties in connection with that project.

## III.

## HAVENS' CLAIM

In January and February of 1980, following Randolph's tender of its completed work and Medusa's equipment "start-up," Kaiser performed its "punch list" inspection of the project. As a result of that inspection certain defects in the insulation work were identified and corrected. That process was completed by early April, 1980. On March 31, 1980, Randolph submitted to Havens its billing for the final contract retainage amount. On April 10, 1980, Havens communicated with Kaiser (Def.Ex. # 147), noting completion of the contract and the lack of notice of any further uncompleted or unsatisfactory work.

Some five months later, on September 20, 1980, storms from Lake Michigan swept through the plant area. An "almost ... catastrophic failure" of the cladding occurred with respect to some of the ducts, together with a similar failure of the cladding on the plant's conditioning towers (installed by another contractor). Further deterioration of the damaged ductwork cladding occurred over the next several months, accompanied by deterioration or destruction of the underlying insulation.

Havens, having settled its dispute with Kaiser and Medusa over responsibility for the partial failure of the ductwork cladding and insulation—as well as other, unrelated claims asserted against it by those parties—now seeks damages from Randolph, asserting that Randolph (via M.I.S.) deviated from contract specifications in applying the ductwork cladding. The pertinent facts, as I find them, are these:

(a) Contract specifications called for cladding material made from "alclad 5005–H16" (a smooth aluminum material), .016 inches thick. Mr. Len Bernardi, job superintendent for M.I.S., felt this material was too thin; recommended to Mr. Foster Sissons, Kaiser's construction manager, that the material be doubled in thickness

(to .032 inches) or that a dimpled or corrugated metal (which is stronger) be used; and thereafter proceeded to use, on one or more but not all ducts, a cladding metal of corrugated configuration.[13] At least some of that cladding sustained damage in the storms of September 20 (or thereafter), as did the specified cladding material on a number of other ducts. The expert testimony establishes that the corrugated metal used by M.I.S. was in fact stronger than the material specified, and that the specified material was in fact too thin for the function required of it.

(b) Contract specifications required the use of "pop rivets or approved alternates," spaced not more than six inches apart on longitudinal laps of the cladding and spaced not more than four inches apart on circumferential joints. Instead of "pop rivets," M.I.S. used sheet metal screws. Further, on the circumferential joints the screws were spaced six to eight feet apart, rather than the required four inches. It appears, however, that this latter deviation was a feature which accompanied the addition of metal retaining bands (not required by the specifications) around the outside of the cladding, with those bands being fastened to the cladding by means of the screws. The screws themselves were preferable to "pop rivets," and the metal retaining bands would have added strength to the system.

(c) According to the contract, the cladding material was to be "lapped" on both longitudinal and circumferential joints. The longitudinal laps were to be "crimped" and the circumferential laps were to be made so that each higher piece of cladding fitted over the lower adjoining piece, thus giving a shingled effect. As applied, the longitudinal laps were not "crimped," and the circumferential laps were occasionally inverted (the number of instances of this being unstated).

(d) The deviations described in items (a) through (c) were identified by Mr. Richard Jenkins, a design engineer, during an inspection he conducted in March of 1981. Because of the damage then existing, Mr. Jenkins found it "virtually impossible" to determine—"in some instances"—how the materials had originally been installed. This qualification does not detract from the finding that, in those instances where observed, the deviations mentioned in items (a) through (c) in fact reflect the original installation process; but it does cause me to reject two other items as deviations: the fact that on some circumferential laps (the number being unstated) the lap was variously one-half to one and one-half inches instead of the required three inches; and the fact that only one "Z clip" was "observed" (that being of stainless steel rather than aluminum, as specified). As to the former matter, Jenkins agreed that the "shortened" laps he measured might have been the product of shifting which occurred after the storm damage. With respect to the latter item, I note that "Z clips" were required only on vertical ducts ("one or two at each circumferential joint," according to the specifications); that the only photographs I can clearly identify as portraying a vertical duct show such extensive damage that few "Z clips" *could* have been observed by Jenkins, unless they were on the ground; and that I have no way of knowing how many other vertical ducts were in a condition which would permit a

---

13. Although Mr. Vogan's testimony was that he "thought" the cladding material used was not as specified, he did not elaborate on what he understood the nature or extent of the difference might have been. On the other hand, the report rendered by Mr. Richard Jenkins (who inspected the project in March, 1981 to determine what contract deviations had occurred, *see* text *infra* ) makes no mention of *any* deviation with respect to the type of cladding material used; nor did Havens elicit any testimony on the subject from Mr. Jenkins in his direct examination. It was only during Mr. Jenkins' cross examination that Randolph developed the fact that a corrugated material had been used. The photographs introduced by Havens, however, clearly show that a corrugated material was not used on *all* ducts. In the circumstances the only conclusion I can reach is that a corrugated material was used on *some* ducts (how many and which being unknown); that this was the subject of Mr. Vogan's understanding; and that the remaining ducts received the specified material.

determination of the number of "Z clips" used. In short, I am uncertain of the real significance of the fact that only one "Z clip" was found.

(e) The contract specifications were themselves defective with regard to the type of cladding material required and the lack of any "subgirt" system for attaching the cladding to the duct.

(f) The insulation and cladding were installed with the ducts on the ground, prior to erection. Mr. Sissons and his subordinates, Mr. Waggoner and Mr. Whims (all thoroughly familiar with the specifications, and charged with insuring compliance), inspected that work frequently as it was in progress, and were well aware of the method of installation and of the deviations covered by items (a) through (c) (with the possible exception of whatever inverted circumferential laps might have existed). In addition, Medusa's individual contract representative (again, a person fully knowledgeable of the specifications) was on the job site on a full time basis. No objections were ever voiced by any of these persons with regard to any of the deviations covered by items (a) through (c).

(g) Following erection of the ducts, Mr. Sissons and others performed Kaiser's "punch list" inspection of the completed ductwork. Certain defects in the insulation and cladding were discovered and corrected. As that was done Kaiser "signed off" the punch list, signifying its approval of and satisfaction with the work. No comments were made during this process with respect to any of the deviations covered by items (a) through (c), although those deviations would have been open and obvious—in fact impossible to miss.

(h) Medusa had already begun its use of the facility prior to the punch list inspection. It continued its use of the facility thereafter. The deviations mentioned in items (a) through (c) were open and obvious to Medusa—in fact, again, impossible to miss (with the possible exception of any inverted laps located high on the ducts). No complaint or objection was ever made

until after Mr. Jenkins' report of March, 1981.

(i) There is no testimony, expert or otherwise, as to the causal relationship, if any, between the deviations mentioned above and the ultimate failure of the cladding and insulation system which followed the storms of September 20. I note, however, that the deviation described in item (a) (cladding material) resulted in a feature of the system that was stronger than the specifications provided for. The same is potentially true of the deviation mentioned in item (b) (screws and banding).

(j) The cladding and insulation on some ducts did not require repair. That which did was ultimately repaired or replaced at a total cost of $499,479.91. The repair cost was increased by the fact that the ducts were of course already erected, and much of the work had to be carried out high in the air.

(k) As repaired and replaced, the new cladding and insulation system included features not provided for in the original specifications, as follows:

(1) The insulation material was changed from a two-inch thick spun glass blanket to a "semi-rigid board type" insulation, thus providing a stronger element for the system. The additional cost for this item, if any, is unknown.

(2) Bands were used on the outside of the cladding. Since this appears to be essentially the same system used by M.I.S. originally, it is a fair inference that the basic cost was no greater than that incurred with the original system.

(3) The cladding material itself was "3003–H14" aluminum, .032 inches thick (double that of the material originally specified). In addition, corrugated metal was to be used on rectangular or flat ducts. The added cost was $3,750.

(*l*) Of the $499,479.91 repair and replacement cost, Kaiser contributed $80,000 by way of its cost in preparing new specifications, and $196,500 in cash. Of the remaining amount, $192,799.67 was contributed by Havens (part of this as retainage already held by Medusa) and $30,180.22 was

paid by Medusa. After deduction of the cost of new material items not included in the original specifications, Havens' proportionate share of the balance ($495,729.91) was $191,351.74.

(m) The above sums of money were paid by Havens, Kaiser and Medusa under a settlement agreement which, among other things, disposed of (1) Havens' $150,000 claim against Medusa and Kaiser for contract retainage; (2) Kaiser's separate Michigan suit (under an assignment of Medusa's claims) against Havens for damages arising from the cladding and insulation failure; and (c), Medusa's $2,649,149 counterclaim against Havens for construction delays and the cladding and insulation failure.

## A.

### BASIS OF CLAIM

At least as pleaded and argued, Havens apparently conceives its claim to be one simply for breach of contract, upon a theory that deviations from specifications or defective workmanship (or both) represent breaches of the subcontract between it and Randolph; that those breaches caused the partial cladding and insulation failure which occurred on and after September 20, 1980; and that Havens itself has somehow sustained damage as a result.

At no time has an indemnification theory, contractual or otherwise, been argued. However, although I am reluctant to raise and decide, *sua sponte*, an issue which Havens itself has either overlooked or chosen to ignore, fairness compels me to note both that the real basis for the claim, as it reaches me, would in fact appear to be that of indemnification for the sums paid by Havens under its settlement agreement with Medusa and Kaiser, and that paragraph 15. of the "Terms & Conditions Applying to Subcontractors And/Or Suppliers" provides a contractual basis for its assertion. Before proceeding to the merits of the claim, under whatever theory addressed, I thus pause briefly to determine what impact those facts may have.

The Missouri law (which must govern here, under the subcontract's choice of law provision) with regard to indemnification for amounts paid in *settlement* of a claim has not been ruled by the state's supreme court. One older decision by a court of appeals followed the rule generally in vogue at that time, requiring that one who seeks indemnity—contractual or otherwise—upon any claim which has been settled must prove both the facts upon which his liability to the claimant would depend (actual liability) as well as the reasonableness of the settlement amount. *Wilson v. Massachusetts Bonding & Ins. Co.*, 238 Mo.App. 882, 190 S.W.2d 944, 947 (1945); and *see generally* 41 *Am.Jur.2d*, Indemnity § 33 (1968). On the other hand, a more recent ruling by another court of appeals has squarely adopted the view announced by the Eighth Circuit and several other federal courts: that where (as here) a contract provides that the indemnitor will defend against claims as well as indemnify against liability or loss, and where the indemnitor refuses to assume the defense and denies liability, the indemnitee need only prove that its settlement was reasonable, prudent and made in good faith. *See Missouri Pacific R. Co. v. Rental Storage & T. Co.*, 524 S.W.2d 898, 908–09 (Mo.App. 1975), and cases cited. However, even if the latter view represents the position the Missouri Supreme Court would take (and I think it does), I do not believe it can be applied here.

There is no proof that Randolph refused the defense of any claims asserted against Havens in the Michigan suit; and Havens effectively pre-empted the matter as far as *this* case is concerned by initiating its own declaratory judgment suit against all parties, apparently in an effort to litigate in a forum more convenient to it. The resulting plethora of counterclaims and cross claims included actions against Havens for matters having nothing to do with the cladding and insulation damage, as to which Havens had a potential direct exposure for its own acts and for which (to that extent) Randolph had no duty either to defend or indemnify. *See, e.g., Missouri Pacific Rail-*

*road Co. v. Arkansas Oak Flooring Co.,* 434 F.2d 575, 579 (8th Cir.1970). How Randolph might even have attempted to "assume the defense" in these circumstances is unknown. Further, in settling with Medusa and Kaiser—a settlement reached, so far as the record shows, without any notice or tender to Randolph—Havens also disposed of those other claims against it, with no attempt to segregate the cladding and insulation claim and in fact with more apparent concern for its ability to assert all such claims back against Randolph than with the prudence of any settlement of the cladding and insulation matter itself.[14]

Given all this I think it appropriate to require that Havens establish its actual liability to Medusa in connection with any indemnification claim it might assert here. For the reasons which follow I conclude that it has not done so; nor, for the same reasons, has it established its right to damages under the breach of contract theory it actually pursues.

### B.

### DEVIATIONS; ACCEPTANCE

■ Where the owner accepts a structure without complaining, within a reasonable time, of defects or contract deviations which are known to him or which are open, obvious and apparent, he is precluded from seeking damages for those defects or deviations. *Florida Ice Machine Corp. v. Branton Insulation, Inc.,* 290 So.2d 415, 418, 421–22 (La.App.1974); *Thomas v. Duffield Drilling Co.,* 398 P.2d 852, 855 (Okl. 1964); *Barrie v. Abate,* 209 Md. 578, 121 A.2d 862, 864 (Md.App.1956); *Kandalis v.*

*Paul Pet Construction Company,* 210 Md. 319, 123 A.2d 345, 347 (Md.App.1956); *Galvin v. Keen,* 100 Ohio App. 100, 135 N.E.2d 769, 770 (Syllabus # 2), 772–73 (1954); 17 A C.J.S., Contracts § 514(2) (1963). The underlying principle may be viewed as that of acceptance, or as that of waiver, *see Thomas v. Duffield Drilling Co., supra; Galvin v. Keen, supra;* the result will be the same in either event.

I believe the rule is applicable in this case. Here, the deviations were not only previously known to Kaiser—designated in the contract as the "Owner's representative"—but were readily apparent during Kaiser's punch list inspection, made after completion and tender of the work. Certain defects were noted and corrected at that time, all to Kaiser's satisfaction; no mention was made of any of the deviations now at issue. Of most importance, however, is the fact that the deviations (with the possible exception of any inverted laps that might have been located high on a duct) were open, obvious and apparent to Medusa itself during all of the more than five months it operated the facility after Kaiser "signed off" the punch list (early April, 1980) and before the storms of September 20—again with no complaint being made. In circumstances such as these a conclusion that the work—with those deviations—was in fact accepted, or that those deviations were effectively waived, is well-nigh irresistible.[15]

■ It is true that the record does not reflect the issuance—even yet for that matter—of a "Certificate of Completion and Acceptance" (*see* Section 28B of the "gen-

---

**14.** The settlement document, for example, includes the parties' statement that "the delay in completion ... [was] caused by Randolph and not Havens or [Kaiser]." *See* paragraph 10.; and *see also* paragraph 3. As the facts mentioned in connection with Randolph's counterclaim will reveal, that was simply not the case; and could not truly have been thought by the parties to be so. I can only conclude that the reason for such a provision was an attempt to advantage Havens in pursuing claims on that subject against Randolph.

**15.** Probably "acceptance," in the present context, and certainly "waiver," are affirmative de-

fenses which must be specifically pleaded. *See* Rule 8(c), Fed.R.Civ.P. Randolph did not plead either. Evidence on the subject was freely presented without objection, however, and the subject was fully argued by both sides, again without objection. In these circumstances I believe the matter has effectively been tried by consent, just as would have been the case had the same presentations been made to a jury. *See* Rule 15(b), Fed.R.Civ.P.; 6 *Wright and Miller, Federal Practice and Procedure* § 1492 (1972).

eral terms and conditions"). A formal acceptance of that sort, however, can be waived, *see Housing Auth. of Pittsburg v. Sanctis Const.*, 158 Pa.Super. 71, 43 A.2d 581, 583 (1945); 17 A *C.J.S., supra* § 492(2), at 698; and the same circumstances, noted above, which lead me to conclude that the work was in fact accepted lead me to a similar conclusion on this point.

These conclusions also dispose of Havens' theory that liability may be imposed under section 23A of the "general terms and conditions," which in effect undertakes to place the risk of loss for damage to or destruction of the work upon the contractor, prior to completion and acceptance by the owner. *See*, e.g., *Foley Co. v. L.G. Barcus & Sons, Inc.*, 660 S.W.2d 307, 309–11 (Mo.App.1983). In point of fact the work *had* been completed, and accepted, by Kaiser and Medusa long before September 20, 1980. Havens' argument on the matter does, however, serve to underscore the fundamental weakness of its more general argument on the subject of acceptance, since the result—as applied here—would be to suggest an intention by the parties that Medusa take possession of the completed and inspected work and utilize it indefinitely, all the while leaving the risk of loss for damage or destruction, from *any* cause, upon Havens and Randolph. Neither common sense nor the facts and circumstances of the parties' conduct commends such an idea.

Finally, I note Havens' reference to section 28 of the "general terms and conditions," which in effect provides that *nothing* done by Kaiser or Medusa "shall be considered ... an acceptance of defective material or workmanship or shall be an admission of the Contractor's satisfactory performance of the work...." The answer to the present question, however, does not depend upon any "admission" by Kaiser or Medusa that Randolph's work was "satisfactory;" it is concerned, instead, simply with whether that work and the deviations at issue were in fact *accepted*. Nor, as explained in Part C hereof, can those deviations properly be considered as something involving "defective material or workmanship," except as to inverted circumferential laps; and as pointed out in Parts B and C, the occasional existence of those inverted laps does nothing to aid Havens' claim. In short, in my judgment section 28 does not control the questions which must be resolved here.

## C.

## DEVIATIONS; CAUSATION

■ Given the lack of evidence as to a causal relationship between any contract deviations and the ultimate damage to the ductwork cladding and insulation, Randolph asserts that a fundamental element of Havens' proof is missing. I agree.

■ It is true that an owner is entitled to have a structure built in keeping with contract specifications which govern the work, and that a departure from those specifications—absent the consent of the owner or his authorized agent, or a waiver—will render the contractor liable for the necessary cost of bringing the structure into compliance with the specifications. *Whitfield Const. Co., Inc. v. Commercial Devel. Corp.*, 392 F.Supp. 982, 1001–02 (D.V.Is.1975); *Thomas v. Ronald A. Edwards Const. Co., Inc.*, 163 Ga.App. 202, 293 S.E.2d 383, 386 (1982); *Shimek v. Vogel*, 105 N.W.2d 677, 684 (N.D.1960); and *see generally* 17A *C.J.S., supra*, § 509, at 817–20. This is so even though the specifications were defective, or the deviation otherwise results in a better or more valuable piece of work. *Whitfield Const. Co., Inc. v. Commercial Devel. Corp., supra.* That particular rule cannot be applied in the present case, however, even if I overlook the question of consent, for the simple reason that there is no evidence as to the reasonable cost which would have been associated with bringing the cladding into compliance with the specifications; *viz*, the cost of replacing the corrugated cladding material, removing the bands and inserting the appropriate number of "pop rivets," crimping the longitudinal laps and correcting whatever inverted vertical laps may

have existed. I do know, of course, the contract price for the entire insulation and cladding work ($295,000, as paid to M.I.S.), but this figure is of no aid since it includes a number of things of obviously substantial cost which would not have been involved in correcting any cladding deviations (e.g., the insulation, the cladding which did meet specifications, the wire mesh material, and the labor involved in applying all those things). I also know the total, ultimate cost of repair of the cladding *and* insulation, after the "almost . . . catastrophic failure" of September 20, 1980, and after some six or seven months further deterioration ($495,729.91, with deductions for items not covered in the original specifications or work); but that figure is again of no help—for purposes of the instant rule—since it too includes items which would not have been required in simply correcting deviations with respect to the cladding (e.g., conforming cladding material, insulation, wire mesh, etc.).

It is also true that in some states this same basic rule—or something closely related to it—has been extended to cover damages of a more consequential nature, such as those involved here. Actually, two variants of this theory exist: that apparently originated by the Illinois Supreme Court in *Clark v. Pope*, 70 Ill. 128 (1873), and *see also Corbetta Const. Co. of Ill. v. Lake County Pub. Bldg. Com'n.*, 64 Ill. App.3d 313, 21 Ill.Dec. 431, 381 N.E.2d 758, 769 (1978); *Robert G. Regan Co. v. Fiocchi*, 44 Ill.App.2d 336, 194 N.E.2d 665, 668 (1963), which renders a deviating contractor liable for whatever may subsequently happen to the structure, without resort to any formal proof of causation if the deviation was "material," and in fact denies the contractor even the ability to offer an affirmative defense that the damage was caused by something other than his deviation, *id.* at 132–33; and that followed by the North Carolina Court of Appeals in

*Burke City Public Sch., etc. v. Juno Const.*, 50 N.C.App. 238, 273 S.E.2d 504 (1981), which recognizes the general rule that a plaintiff must prove causation of damages which are alleged to arise from a breach of contract, *id.* 273 S.E.2d at 507, in effect treats proof of a deviation as creating a prima facie case on that point, and allows the contractor to rebut by proving that the damage was not in fact caused by the deviation, *id.* at 507–08.[16] Neither variant of the rule can be applied, however, if the deviations occurred with the "knowledge and consent" of the owner. *See Clark v. Pope, supra;* and *see also Mann v. Clowser*, 190 Va. 887, 59 S.E.2d 78, 85 (1950); *Curtain v. Somerset*, 140 Pa. 70, 21 A. 244 (1891). As mentioned under Part A, with the possible exception of inverted circumferential laps the present deviations were in fact fully known to Kaiser as the work was being done, with no objection being made; were obvious at the time of the punch list inspection (when other matters were noted and corrected), with no exception being taken; and were open and obvious during the five months Medusa—again without complaint—thereafter operated the facility prior to September 20. Clearly these deviations were "known" to both Kaiser and Medusa; and given the other circumstances listed it becomes difficult to avoid the conclusion that they were tacitly, if not formally, consented to as well.

Havens refers again, in this connection, to section 28 of the "general terms and conditions." For the reasons expressed under Parts A and C, I find that section 28 has no application to the instant point except as to inverted laps. In addition, however, I note that the rules under discussion here are burden of proof rules of the common law. They do not depend upon contract provisions for their existence, and in my judgment owe no allegiance to provisions such as section 28 in their application.

---

**16.** The Missouri case law furnishes no real guidance as to which of these theories the Missouri courts would follow, or whether they would accept either. In my judgment neither *Will v. Carondelet Savings & Loan Association*, 508 S.W.2d 711 (Mo.App.1974), nor any of the other cases cited by Randolph, or *Ozark Skyways, Inc. v. Bomark Steel Structures, Inc.*, 647 S.W.2d 170 (Mo.App.1983), cited by Havens, provide any answer.

As concerns any application of either the Illinois or the North Carolina rule, this leaves only the inverted circumferential laps, to whatever extent they existed. Stated shortly, I simply cannot find these to have been significant or "material" deviations with respect to the cladding failure and ultimate damage which occurred, particularly since I have no idea how widespread they may have been. I recognize this holding imports a sort of threshold "causation" element into Havens' burden of proof under those rules; but some basic requirement of this nature is only logical and even the Illinois rule seems to recognize it ("material" deviation). Suppose, for example, that a contractor builds a house under specifications which call for light green paint and instead applies white paint, with the house collapsing after a storm. It makes no sense to suggest that he should, by reason of that deviation, be held responsible for all resulting damage and in fact be denied the ability to prove that paint colors had nothing to do with the collapse (the Illinois rule), or even that he should be required to go forward with that proof (the North Carolina rule). Instead, it seems to me, an application of either rule necessarily requires that the deviation in question be such as to permit a rational conclusion— even if based only on the fact finder's common sense—that it was, more likely than not, at least a contributing cause of the damage. In my opinion the available facts regarding any inverted circumferential laps fall short of that standard.

I conclude that neither the Illinois rule nor the North Carolina rule is of any assistance to Havens here. There is no other proof of the causal relationship between any contract deviations and the damages at issue. I believe those findings are fatal to Havens' claim.

### D.

### BREACH OF WARRANTY

Section 23C of the "general terms and conditions" provides that the

> Contractor hereby guarantees the Work to be performed hereunder against de-

fects in material and workmanship ... for a period of one (1) year after the date of acceptance as set forth in the "Certificate of Completion and Acceptance....

Havens suggests that the deviations at issue here are in fact "defects in material and workmanship," for which liability may be imposed under this provision. I believe the argument must be rejected.

As Randolph correctly observes, a "deviation" (a departure from contract specifications) does not necessarily equate to a "defect" in either "material" or "workmanship." As used here in connection with both the word "material" and the word "workmanship," "defect" was rather clearly intended to take its ordinary, general meaning: an irregularity or departure from the norm which causes weakness, failure or a spoiled appearance. *See generally Webster's Third New International Dictionary* 591 (1981); *Black's Law Dictionary* 376 (5th ed. 1981). There is no indication that the corrugated cladding material which was applied to some ducts—or the bands and sheet metal screws—were themselves internally flawed in any manner. Nor is there a "defect" even in the sense that those items were generally weaker or less suitable than the materials called for by the specifications; to the contrary, they were stronger or at least equally as strong. And, of course, it seems clear that a "deviation" may in fact be accompanied by entirely satisfactory "workmanship"—that is, an application of that degree of skill ordinarily expected of persons learned in the trade. No "defect" in "workmanship" of that sort is established by this record, except with respect to the occasional inverted circumferential laps.

I believe one can find, even without expert testimony, that those inverted laps do represent a "defect" in "workmanship." That finding, however, is of no real significance here since I have no way of determining—even if I knew how many inverted laps there were—that they had any possible causal relationship to the cladding failure. As with any express warran-

ty claim involving a loss which has several potential causes, some covered by the warranty and some not, the burden of proof is on the claimant to establish a causal relationship between the breach of warranty and the loss. *Southern Illinois Stone Co. v. Universal Engineering Corp*, 446 F.Supp. 900, 904 (E.D.Mo.1978); *Turner v. Central Hardware Co.*, 353 Mo. 1182, 186 S.W.2d 603, 607 (1945). Such proof is absent here.

## IV.

### RANDOLPH'S COUNTERCLAIM

Randolph's counterclaim is divided between nine different counts. Stating them in their most logical order, Count V seeks compensation for additional work resulting from "unanticipated structural interferences and job disruptions;" Count VI seeks similar compensation for work relating to "C Duct;" Count IV requests recovery for additional work involved with a "misalignment of bolt holes in the duct work and expansion joints;" Count II claims reimbursement for "extended field overhead costs" resulting from being on the job longer than anticipated; Count I seeks a similar recovery for wage escalation costs; Count VII prays for recovery of $70,557 in scheduled contract payments still retained by Havens; Count III seeks compensation for "costs of labor inefficiency incurred in performing on an extended overtime basis;" Count IX attempts to assert a claim for damages on behalf of M.I.S., Randolph's subcontractor; and Count VIII asserts an alternative quantum meruit claim.

### A.

### COUNT V.

 Randolph's claim under Count V is fully supported by the evidence. When Randolph originally calculated its expenses

and charges for the Havens' work it worked from the specifications and drawings then available to it. Those documents indicated the location and support points for the duct work, but did not indicate the presence of additional structural steel. Custom in the industry, established both by expert testimony and by reference to the provisions of the American Institute of Steel Construction (AISC) manual (adherence to which was in fact required by the contract), made it reasonable for Randolph to rely upon the understanding that when it did perform its work there would be no additional structural steel in place which would interfere with that work. Because of the delay in delivery of the ductwork, however, by the time Randolph was able to commence performance entire frameworks of structural steel and even complete buildings had already been erected in areas where some of the ducts were to be installed. This problem created significant additional work and expense for Randolph.

The costs of that additional work are detailed in Def.Ex. #1043, a Rule 1006 summary [17] based upon Randolph's underlying personnel time records.[18] As demonstrated by expert testimony, those records and the interpolations Randolph made from them provide an appropriate basis for determining both the additional man hours and additional equipment hours involved. *Compare U.S. Industries, Inc. v. Blake Construction Co.*, 671 F.2d 539, 547 (D.C. Cir.1982); *General Insurance Co. of America v. Hercules Construction Co.*, 385 F.2d 13, 20–1 (8th Cir.1967). The total, including wage differential for overtime work, is $121,050.65. Further, Randolph is entitled to recover the added amount of $11,463.50 backcharged to it by Havens for work accomplished by M.I.S. in repairing insulation and cladding on "C Duct" ($10,-585 backcharged, plus 10% markup). The

---

**17.** The document contains certain explanatory notes which technically fall outside the scope of a Rule 1006 summary. The notes are generally duplicative of Mr. Vogan's testimony, however, and I accept them as a pedagogical device in that respect. *See* 5 *Weinstein's Evidence* 1006–15 to 1006–17 (1984).

**18.** Those underlying records are attached to the exhibit and were shown to be admissible in evidence under Rule 803, Fed.R.Evid. Havens' objection thereto will be overruled.

damage to that insulation and cladding occurred as a direct result of having to install the duct through a hole—itself too small—in an already erected building (see discussion under Count IV, *infra*). The total of all such costs is thus $132,694.15.

Havens argues that any such recovery is precluded both by the "no damages for delay" clause of its proposed formal contract and by the general rule that a contractor's performance will not be excused, or made subject to additional compensation, by virtue of the occurrence of unforeseen difficulties. The short answer to both propositions is that the contract actually in effect between the parties, as found in Section II of this Opinion, did not contain a "no damages for delay" clause and in fact specifically made provision for Randolph's recovery of such damages (*see* Randolph's letter of May 9).

 Havens also suggests that Randolph "was in as good a position as anyone" to determine that there might or would be structural steel interference with its work, presumably suggesting some sort of waiver. The difficulty, again, is that the contract provisions effectively shifted that risk. Indeed, that would appear to be precisely what Randolph intended by its letter of May 9; and for good reason, given the fact that approximately two months' delay had already occurred, with structural steel being erected to some extent in the interim.

 Finally, Havens urges that the problem was actually caused in part by Kaiser's failure to coordinate job site activities; a proposition with which Randolph agrees. That does not, however, create any defense to the instant claim as asserted against Havens. While it is true (absent a contrary contractual provision) that a general contractor will ordinarily not be liable to its subcontractor for damages resulting from delay, unless the delay is in fact caused by the general contractor or some agency or circumstance under its control, *McDaniel v. Ashton-Mardian Co.*, 357 F.2d 511, 514 n. 2 (9th Cir.1966); *McGrath v. Electrical Constr. Co.*, 230 Or. 295, 364 P.2d 604, 607–08 (1961); *Doyle & Russell,*

*Inc. v. Welch Pile Driving Corp.*, 213 Va. 698, 194 S.E.2d 719, 721 (1973); *Frank T. Hickey, Inc. v. Los Angeles Jewish Com. Coun.*, 128 Cal.App.2d 676, 276 P.2d 52, 58 (1954), that principle does not require, in cases of *multiple* causation involving the general contractor and others, that the subcontractor show the proportionate part played by the general contractor and segregate the loss accordingly. *See* 5 *Corbin, supra* § 999, at 24–25. The rule to be applied in that situation is instead the ordinary contracts rule applicable to damages involving multiple causes: that if the defendant's breach or fault was a "substantial factor" in causing the injury, the defendant will bear full responsibility for it even though there were other, contributing causes. *Id.* Havens' delays were clearly a "substantial factor" in causing the damages here. The fact that Kaiser or other parties may also have played some part in connection with the problem is immaterial. *Quaker Empire Const. v. D.A. Collins Const.*, 88 App.Div.2d 1043, 452 N.Y.S.2d 692, 694 (1982).

### B.

### COUNT VI.

As noted, the claim here is closely related to those asserted in Count V. It concerns, however, a specific set of problems encountered with "C Duct," a large duct containing an "elbow" or bend.

By the time Randolph was able to proceed with the installation of "C Duct," the building it was to serve had already been erected; a condition Randolph could not reasonably have anticipated at the time it supplied its original cost figures to Havens. Although a hole had been left in the roof through which the duct was to be inserted, the hole proved too small to accomodate the "elbow" of the duct. After attempting to erect the duct Randolph had to lower it to the ground, cut off the "elbow," thread the main portion of the duct through the hole and reweld the elbow in place. All this led to the expenditure of an additional $9,208.30 in labor and equipment costs, as

documented by Def.Ex. # 1044, another Rule 1006 summary based upon the underlying work records.

Havens advances, for the most part, the same arguments made with respect to Count V. Those arguments are subject to similar difficulties here and are rejected. In addition, however, Havens also asserts that Randolph "waived" its right to any compensation "by failing to comply with the contract provisions for extra or 'changed' work." Presumably Havens' reference is to paragraph 10. of the "Terms & Conditions Applying To Subcontractors And/Or Suppliers," which provides, *inter alia,* that

> [n]o change shall be made in the Purchase Order and no claim of Supplier/Subcontractor for extra work will be allowed unless such extra work ... [is] ordered by Havens in writing and Havens agrees in writing to pay such extra,

or to "Special Condition" 9, which required that

> [e]xtra work that Kaiser directs Randolph to do on site is to be authorized and time charges approved in writing by Kaiser. These authorizations should be approved prior to commitment to do the work with Havens handling it as a [change] order or add to the contract.

Randolph responds in part with the suggestion that "waiver" is an affirmative defense, and that Havens' failure to plead it here results in an exclusion of the matter from the case. That would ordinarily be so, *see* Rule 8(c), Fed.R.Civ.P.; 5 *Wright and Miller, Federal Practice and Procedure* § 1270, at 298 n. 5, § 1278 (1969), but since at least paragraph 10. effectively makes compliance with its terms a condition precedent to any claim falling within its scope, the issue appears to be controlled by Rule 9(c) rather than 8(c). Rule 9(c) placed a requirement upon *Randolph* to plead, affirmatively if only generally, "that all conditions precedent have been performed or have occurred." Had Randolph done so Havens would then—but only then—have been obliged to make its denial of the point "specifically and with particularity." *See* Rule 9(c), Fed.R.Civ.P.; 5 *Wright and Miller, supra* § 1304. Randolph, however, did not so plead; and in fact, to the extent its claims actually do involve compliance with any condition precedent, by that failure rendered those claims subject to dismissal for failure to state a cause of action. *See* 5 *Wright and Miller, supra* § 1303 and cases cited. Since evidence pertaining to compliance with paragraph 10. (or any other condition precedent) has been freely presented by both parties, and fully developed, I will treat the entire subject as tried by the consent of the parties, *see Resolute Ins. Co. v. Percy Jones,* 198 F.2d 309, 311 (10th Cir.1952); *Pearl Assur. Co. v. First Liberty Nat. Bank,* 140 F.2d 200, 202 (5th Cir. 1944); but Randolph is hardly in any position to complain of a pleading failure by Havens. The mere fact that Havens chose to refer to the matter as a "waiver" does not change the result.

■■■ There are, however, other good reasons for rejecting Havens' argument. First, even if I assume that Randolph's letter of May 9 does not control, there is respectable authority for the proposition that when extra or additional work is caused not by change orders (formal or informal) or other events in the ordinary course of contract performance but instead by actual breaches of contract by the other party which result in extra expense beyond the foreseeable scope of normal contract performance, the matter falls outside the coverage of a provision such as paragraph 10. or Special Condition 9. *Nat Harrison Associates, Inc. v. Gulf States Utilities Co.,* 491 F.2d 578, 583 (5th Cir.1974); *United States ex rel. Baltimore Brick Co. v. John A. Johnson & Sons, Inc.,* 65 F.Supp. 514, 527 (D.Md.1945), *aff'd.* 153 F.2d 534 (4th Cir.1946), *cert. den.* 328 U.S. 865, 66 S.Ct. 1372, 90 L.Ed. 1636 (1946); *Ballenger Corp. v. Dresco Mech. Contractors,* 156 Ga.App. 425, 274 S.E.2d 786, 796–97 (1980); and *see also St. Louis Testing Lab, Inc. v. Mississippi Val. Struc. Steel Co.,* 254 F.Supp. 47, 55–6 (E.D.Mo.1966), *aff'd* 375 F.2d 565 (8th Cir.1967). In the final analy-

sis, of course, any application of this rule depends upon a construction of the particular contract language in question; but in view of the actual wording of both paragraph 10. and Special Condition 9 it seems fully justified here. Read as a whole, the basic thrust of paragraph 10. is to set forth procedures for implementing work change orders made by Havens; Special Condition 9 relates to extra work ordered by Kaiser. Neither of those things is the sort of problem with which the present claim is concerned; nor is it concerned, in a more general sense, with extra or additional work which simply arose in the ordinary course of performance under the contract. The claim relates, instead (as with the claim under Count V), to work which was beyond the foreseeable scope of any normal contract performance, made necessary by reason of Havens' own delay in delivering ductwork to the site. I do not believe either paragraph 10. or Special Condition 9 has, or was meant to have, any application to that situation.

Second, even if paragraph 10. or Special Condition 9 is theoretically applicable here, the evidence convincingly demonstrates a waiver of any literal compliance with either. As early as June 27, 1979 Randolph communicated with Kaiser, in writing, pointing out the structural steel interference problems which then existed (Def.Ex. # 16). A letter from Randolph to Havens dated July 2, 1979 (Def.Ex. # 10) spoke to the same subject, as did another letter of July 16, 1979 (directed to Kaiser, copy to Havens), in which Randolph made clear its intent to assert a claim for the additional costs generated thereby (Def.Ex. # 18). In fact Randolph continued to send correspondence on the subject to both Havens and Kaiser throughout the remainder of its time on the project (Plt.Ex. # 33; Def.Ex. # 20; Def.Ex. # 23; Def.Ex. # 25; Def.Ex. # 30). With a full awareness of the problem and of the fact that it necessitated additional work by Randolph—an awareness shared by Havens—Kaiser nonetheless required that both structural steel erection and ductwork erection move forward simultaneously. Further, although it

quickly became apparent that the parties were not in total agreement over the exact extent of some of the structural steel interference (*see*, e.g., Def.Ex. # 17 and Def.Ex. # 18), at *no* time was any question of Randolph's compliance with paragraph 10. or Special Condition 9 raised. In fact it appears that the first reference to that subject, by anyone, occurred more than four years later in Havens' *post*-trial brief. Given all this I conclude that the requirements of paragraph 10. and Special Condition 9 were effectively waived, if they were applicable at all. *Compare In re King Enterprises*, 678 F.2d 73, 77–8 (8th Cir. 1982); *E.C. Ernst, Inc. v. Koppers Co., Inc.*, 626 F.2d 324, 329–30 (3rd Cir.1980) (estoppel); *Nat Harrison Associates, Inc. v. Gulf States Utilities Co., supra* at 583–84; *Fanning & Doorley Const. Co. v. Geigy Chemical Corp.*, 305 F.Supp. 650, 670–71 (S.D.W.Va.1969).

A recovery of $9,208.30 will be allowed under Count VI.

## C.

### COUNT IV.

Randolph's work called for the use of approximately 32 expansion joints in connecting particular pieces of duct work. Those expansion joints were to be secured between each duct by means of a flange on the end of the duct and a matching flange on the expansion joint. The flanges were drilled with holes so that the duct could be bolted to the expansion joint.

When Randolph received the expansion joints and duct pieces, approximately 500 of the holes in the flanges on the ducts did not align with the holes on the expansion joint flanges. Randolph had to rebore or ream out those holes so that bolts could pass through them, at a total cost (with mark-up) of $31,064.30, as documented by Def.Ex. # 1042. These facts form the basis of the claim in Count IV.

■ Havens points out that the expansion joints themselves were supplied by Medusa, and suggests (apparently) that

Randolph's remedy (if any) is against Medusa; or in any event that Havens itself had no responsibility for the problem. I reject the contention. In doing so, I lay aside the parties' somewhat metaphysical debate over whether the holes in Havens' ductwork did not match the holes in Medusa's expansion joints, or instead whether the holes in Medusa's expansion joints did not match the holes in Havens' ductwork. The point, as Randolph correctly observes, is simply that the holes did not match; that Randolph had nothing to do with causing the problem; and that Randolph was put to extra work and expense in correcting the problem. This is simply a claim for extraordinary additional work asserted by a subcontractor against his immediate "upstream" contractor, and at least in the circumstances here should be governed by the general theory applied in *Miller v. Guy H. James Const. Co.*, 653 P.2d 221, 224 (Okl. App.1982). That is, where the offending materials were not procured by the subcontractor, but instead were supplied to him by or through the prime contractor—which must be viewed as the situation here even as to the expansion joints, since Randolph had no direct relationship with Medusa—then the subcontractor's appropriate remedy (absent some contractual clause preventing it) is to proceed against the prime contractor, leaving it to the latter, if it wishes, to carry the matter back to the original supplier.

Havens also raises—again—the subject of non-compliance with contract notification procedures, this time by suggesting that Randolph "waived any right ... to extra compensation ... by failing to notify Havens and to document the problem so that Havens could assert Randolph's claim pursuant to the 'changes' article of the contract." Although this argument is less than clear, presumably it relates to Special Condition 9, which in turn makes reference to section 24 of the "general terms and conditions." The latter provision is labeled "changes," and contains detailed terms for implementing work changes ordered by the owner (including Kaiser).

The present claim involves a different sort of problem than that dealt with under Count VI. As far as the notification issue is concerned, however, I believe the same principles apply, with similar results. The nature and source of the problem, together with the type and amount of work needed to correct it, rather clearly suggest it was not a matter which either Special Condition 9 or section 24 was designed to cover. Furthermore, although the record does not show any written complaint or notice of intent to make claim by Randolph prior to undertaking the added work, the parties' treatment of the matter shows the same sort of waiver found with respect to Count VI. Kaiser was well aware of the problem, and of Randolph's additional work as it was occurring, and accepted that work. The reasonable inference from the testimony of Kaiser's construction manager is that Havens, too, was aware of the problem from the outset. And—as with the claim under Count VI—while Kaiser quickly became concerned over just how much extra work was really necessary (*see* Sisson's deposition testimony, admitted in evidence at trial), at no time did either it or Havens suggest any difficulty over Randolph's compliance with Special Condition 9 or section 24. In fact the dispute, both at that time and later, involved whether Havens or instead Medusa should bear responsibility for the problem, with a suggestion being made at one point by Medusa that the two share the cost of the matter equally. In short, as with the claim under Count VI, the parties themselves seem to have dealt with the problem as though Special Condition 9 and section 24 did not exist—presumably because they believed those provisions did not control or because they deemed a literal compliance with them unnecessary. I find no reason to treat things differently now.

██ I conclude that Randolph is entitled to recover the sum of $31,064.30, as and for extra work performed in redrilling and reaming out the bolt holes on the ducts and expansion joints in question.

### D.

### COUNT II

Count II represents Randolph's claim for "extended overhead." Essentially, Randolph asserts that its on-site performance time was originally scheduled by the parties at four and one-half months (March 19, 1979 to August 1, 1979); that its actual on-site time was six and one-half months (June 1, 1979 to December 15, 1979), reflecting an excess on-site time of two months; and that at least one and one-half months of that two month period was caused in substantial part by Havens' delay in the delivery of the ductwork. Randolph's calculation of the dollar amounts involved is contained in Def.Ex. #1040. Those amounts consist of equipment, labor and miscellaneous costs, all grouped under the label "field office support."

Havens' principal objection is that the claim represents a "total cost" theory of recovery, which could be allowed only in certain limited circumstances not present here. *See*, e.g., *U.S. Industries, Inc. v. Blake Construction Co.*, supra at 547; *United States ex rel. United States Steel Corporation v. Construction Aggregates*, supra at 427; *Boyajian v. United States*, 423 F.2d 1231, 1238–44, 191 Ct.Cl. 233 (1970); *J.D. Hedin Construction Co. v. United States*, 347 F.2d 235, 246–47, 171 Ct.Cl. 70 (1965). Randolph counters with the assertion that its theory does not involve a "total cost" approach; that its figures represent an appropriate and realistic effort to calculate "delay" damages not duplicative of other damages asserted elsewhere in its counterclaim; and that even if the court finds its methodology unacceptable it may still be awarded a "jury verdict" on the claim.

As explained in *Construction Aggregates*, supra at 427:

> The total cost method involves computation of both the actual contract costs and the contract costs as estimated in the bid. The estimated contract costs are then subtracted from actual costs to determine costs due to delay.

The vice of this approach is said to lie in the fact that it permits a claimant to recover all losses in connection with a contract, regardless of their nature or cause. *Id.*

A good example of a "total cost" method of proof can be seen in Randolph's alternative quantum meruit claim (*see* Def.Ex. #1038 and supporting testimony). The present claim, however, approaches matters from the other way round: it calculates Randolph's "overhead" costs for an average month on the project, ostensibly undertakes to determine the additional time Randolph was kept on site by virtue of Havens' sole or contributing fault, and multiplies the former by the latter. Whatever other shortcomings this may involve, it is not a "total cost" method of proof.

■ The approach is, however, subject to other difficulties. Stated shortly, the available evidence simply fails to establish a rational basis for concluding that Randolph suffered any "delay" damages, *beyond and apart from those already effectively compensated under Counts IV, V and VI*, as a result of any fault of Havens.

For example, while it is clear that Havens failed to deliver any ductwork at all between March 5, 1979 (when deliveries were scheduled to commence) and approximately June 1, 1979, Randolph sustained no immediate damage by that fact since it did not mobilize any men or equipment for the ductwork job during that time frame, and instead simply proceeded ahead with its AAF work. So far as I can tell it was appropriately compensated for that latter work, either directly under the AAF contract or by way of settlement of its separate claim against AAF for delay on the AAF project.

It is also clear that Randolph did "man" the Havens' job as of approximately June 1, 1979, when the first scattered pieces of ductwork arrived, but was still unable to do any appreciable amount of work thereon until July 15, 1979, when the great bulk of the ductwork arrived en masse. Again, however, it does not appear that any immediate damage arose from that fact, since Randolph simply moved its forces to the

AAF job when their services were not needed for the ductwork, and was fully compensated therefor under the AAF contract. If there was any measurable wasted or overlapping time involved in this, the record does not reflect the fact.

It is of course true that other structures on the site were being erected in the period between March 19 and July 15, thus presenting Randolph with a difficult environment for its ductwork erection when that activity was finally able to begin. Delays and extra work *were* encountered by virtue of that fact. Those matters, however, have already been addressed under Counts V and VI. If there were damages flowing from this particular situation not covered by Counts V and VI, I have no way of knowing what they were or why they were not included in the proof on those counts.

Finally, there is the ineluctable point that Randolph's onsite performance was extended by approximately two months over that originally scheduled. The fact is, however, that much (if not all) of this additional time would seem to relate to either the June 1 to July 15 time period or to the delay and extra work covered by Counts IV, V and VI. Further, I have Mr. Sisson's testimony that there were inefficiencies in performance and supervision by Randolph itself.[19] Between these things, I simply have no way of determining whether *any* of Randolph's additional on-site time resulted from compensable factors *apart* from those already dealt with, or if so how much.

Randolph suggests that I should simply content myself with Mr. Vogan's estimate of a one and one-half month additional delay period. Unfortunately, Mr. Vogan's attempts to explain that estimate do not inspire confidence either in its accuracy or in the general concept behind it. According to Mr. Vogan, the month and one-half period he selected actually relates to the June 1 to July 15 time frame, although he calculat-ed expenses for an "average" one and one-half months of work on the ductwork. As mentioned, however, during that period Randolph in fact used its men and equipment on the AAF project when they were not involved with the ductwork (that involvement, by Mr. Vogan's testimony, being minimal), and in fact was fully paid for the AAF work.

Although some uncertainty as to the *amount* of damages is allowable, the *fact* of damages must be proved to a reasonable degree of certainty and cannot be founded upon mere speculation. *United States ex rel. United States Steel Corporation v. Construction Aggregates, supra* at 428. I do not believe that standard is met with respect to the present claim. To the extent Randolph asks me to accept the claim simply because Mr. Vogan chose a one and one-half month period, without any rational basis I can fathom, or asks me to return a "jury verdict" by formulating some arbitrary rationale of my own, I respectfully decline the invitation. Count II of the counterclaim will be dismissed.

## E.

## COUNT I

■ The hourly rates paid to Randolph employees were governed by collective bargaining agreements. Under those agreements, a wage increase for operating engineers and oilers went into effect as of May 1, 1979, and an increase for boilermakers and laborers became effective July 1, 1979. Randolph asserts that Havens' delay in delivering ductwork effectively caused its performance time to be extended some four and one-half months past the August 1 date originally fixed for completion, and that Havens is accordingly responsible for the increased pay rates which were in effect during all that period. The claim is set

---

**19.** This testimony was so generalized that I did not take it into account in respect of Counts IV, V and VI; but in view of the more amorphous nature of the present claim I believe it appropriate to give it some effect here.

forth in Count I, and calculated in Def.Ex. #1039.[20]

As presented, the claim is subject to certain inherent difficulties. Even if performance had gone forward as originally scheduled (March 19 to August 1), Randolph's operating engineers and oilers would have worked three months (May 1 to August 1) at the increased wage rate, and its boilermakers and laborers one month (July). Absent some additional circumstance, there is no reason to give Randolph more than it bargained for in this respect. Nor is it appropriate, under the facts here, to consider Randolph's *extra* time on-site—i.e., time in excess of the four and one-half month long period originally contemplated—as that additional circumstance. To the extent any such excess on-site time was caused by the factors dealt with under Counts IV, V and VI, the damages awarded there include wages at the increased rate; to the extent it was caused by other factors it was either paid for as AAF work, or cannot rationally be attributed to Havens. *See* discussion under Count II, *supra*.

Nonetheless, the fact remains that Randolph's lump sum bids were presumably calculated on the basis of the wage rates it expected would be in effect during the period of its performance—that is, a one and one-half month period at the lower rate for operating engineers and oilers (March 19 to May 1) and a three and one-half month period at the lower rate for boilermakers and laborers (March 19 to July 1); and that Havens' failure to deliver an appreciable amount of ductwork between March 19 and July 15 effectively prevented Randolph from working *any* period of time at those lower wage rates. In other words, even when any excess on-site time is extracted from the equation, the fact is that Randolph worked all four and one-half months of its originally calculated performance time under the Havens' contract at an increased wage rate, rather than the re-

spective three month and one month periods it had bargained upon. I believe the present claim is appropriate as to the one and one-half month and three and one-half month lower wage rate periods which were thus lost.

Havens argues that it has no responsibility for this item since it had not "guaranteed" or "warranted" that work would start on a specific date, and that Randolph has "waived" the claim in any event by failing to give timely backup support for the claim. I reject both contentions.

As to the first point, the matter is effectively controlled by the terms of Randolph's letter of May 19, 1979, as incorporated into the parties' contract. That letter made specific reference to Randolph's earlier letter of November 29, 1979, which included the schedule for the ductwork delivery. When that fact is coupled with the terms of paragraph "3." of the May 9 letter, it becomes rather obvious that Randolph expected to be compensated not only for future losses but for losses which had already occurred or become inevitable; an expectation which could hardly have been lost upon Havens. Havens' citations to *United States v. Foley Co.*, 329 U.S. 64, 67 S.Ct. 154, 91 L.Ed. 44 (1946), and *Broome Construction, Inc. v. United States*, 492 F.2d 829, 203 Ct.Cl. 521 (1974) are of no assistance to it in this situation.

Havens' second point has already been dealt with in principle under Counts IV and VI. In particular, however, I note that neither paragraph 10. of the "Terms & Conditions Applying to Subcontractors And/Or Suppliers," nor Special Condition 9 or any other provision of the contract between the parties would appear to have any bearing on the sort of item claimed here.

Randolph's claim under Count I will be allowed in the amount of $15,668.01.[21]

---

**20.** Those calculations are based upon the idea that wage rates for operating engineers and oilers *and* for boilermakers and laborers were increased as of May 1, 1980. A review of the actual collective bargaining agreements shows that understanding to be in error. As noted, the

increase for boilermakers and laborers became effective July 1, 1979.

**21.** This amount has been determined by taking the appropriate proportionate part of the total wage rate increases calculated in Def.Ex. #1039.

## F.

### COUNT VII.

Count VII is Randolph's claim for the final contract retention sum of $70,557, which Havens continues to withhold. Havens' sole argument is that it was entitled to refuse payment pending·a resolution of the issues posed by its claim against Randolph for defective cladding and insulation work.

As such, the argument is without merit. Randolph's work had been effectively accepted as of April 10, 1980. No problem arose in connection with the insulation or cladding until September 20, 1980; and in fact Havens was not informed of the matter until "late 1980." No issue regarding deviations or defects was raised until May or June of 1981, some thirteen or fourteen months after Randolph's final billing.

 It is true that Medusa withheld Havens' final payment ($116,299.67), originally because of the dispute between Medusa, Kaiser and Havens over responsibility for delay in completion of the ductwork, and later both in connection with that dispute and because of the cladding failure; and further true that paragraph 12. of the "Terms & Conditions Applying To Subcontractors And/Or Suppliers" provides for final payment to Randolph

> after Supplier/Subcontractor has satisfied Havens ... and Owner of its compliance with all the terms and conditions hereof and, if so satisfied, twenty (20) days after Havens has received final payment from the ... Owner.

Provisions worded in the manner of paragraph 12., however, are not ordinarily construed literally. Instead, unless its language is plain and unambiguous in making payment by the owner an express condition precedent to the contractor's duty to pay, such a provision will be construed as postponing the contractor's obligation only for a "reasonable time." *Byler v. Great American Insurance Company*, 395 F.2d 273, 276–77 (10th Cir.1968); *Thos. J. Dyer Co. v. Bishop Internat'l. Eng. Co.*, 303 F.2d 655, 659–61 (6th Cir.1962); *Moore v.*

*Continental Casualty Company*, 366 F.Supp. 954, 955–56 (W.D.Okl.1973). I believe that rule is applicable here. Indeed, the pertinent language of paragraph 12. is for all practical purposes the same as that dealt with in *Moore v. Continental Casualty Company, supra*. I further believe that a three month period (a calendar quarter) would be the maximum "reasonable time" for delay. That three month period expired long before any finger of blame was pointed at Randolph in connection with the cladding failure.

I will, accordingly, treat Randolph's right to its final retainage payment as having accrued July 10, 1980, and will award prejudgment interest on the amount thereof from that date. *See Twin River Const. Co. v. Public Water Dist., supra* at 694–95.

## G.

### COUNT III

 Randolph argues that Kaiser's decision to require a large amount of overtime work, particularly during the month of October, 1979, resulted in a loss of labor efficiency and a consequent further expansion of Randolph's costs. Count III represents the claim for that additional cost.

The proof demonstrates that a large number of overtime hours were in fact worked during the month of October, 1979. The testimony also demonstrates generally that the working of overtime hours does adversely affect labor efficiency.

If no more than this was necessary I would have little difficulty with the claim. In order to address the matter, however, it is also essential that the court have some method of determining what the efficiency loss might have been. It is here that the present claim encounters difficulty.

In support of this aspect of the claim Randolph offered the testimony of Mr. Lon Hilker, a registered professional engineer presently employed as vice-president in charge of scheduling and coordination for a major Kansas City area structural steel contractor. Mr. Hilker explained that his own observations led him to conclude that

overtime hours result in decreased worker efficiency. He had not, however, ever engaged in any studies regarding how to calculate that decreased efficiency factor, or had any experience in calculating such a factor for his own men or for others. Instead, he simply identified a chart—of unknown origin, which purported to incorporate statistics from the Department of Labor, the National Electrical Contractors Association and the Mechanical Contractors Association—as a document with which he was familiar and which contained information from "reliable sources." He candidly admitted that he did not consider himself competent to state an opinion on the subject, "other than what I have read in the studies."

Generally speaking, the very nature of a labor inefficiency claim requires expert testimony. *Luria Bros. Co. v. United States*, 369 F.2d 701, 713, 177 Ct.Cl. 676 (1966). I am unwilling to accept Mr. Hilker as an "expert" in this area. Aside from the general observation that overtime leads to decreased efficiency—a generality over which there is no quarrel, and which in fact was corroborated by Havens' own witness (Foster Sissons)—Mr. Hilker had neither training nor experience in how one would calculate that inefficiency. One of those two factors is ordinarily necessary to qualify a person as an "expert" on any subject. *See* Rule 702, Fed.R.Evid. (an "expert" is one whose "knowledge, skill, experience, training, or education" qualifies him to render an opinion on scientific, technical or other specialized subjects). In fact Mr. Hilker actually expressed no "opinion" at all on the point, aside from observing that the chart offered to him contained information from "reliable sources." His testimony thus stands not as an expert's opinion, with reliance upon the chart as a basis therefor, but instead simply a vehicle for attempting to introduce information from the chart.

Havens' objection to that effort will be sustained. Since I decline to accept Mr. Hilker as an expert, there is no predicate for a use of the chart as a "learned treatise" under Rule 803(18), Fed.R.Evid. Neither is there any other demonstrated basis for its admissibility.

Lacking the information the chart contains, or any other evidence concerning the inefficiency factor produced by overtime work, I have no method—other than complete, uninformed speculation—of making the calculations necessary for the present claim. Randolph's claim under Count III will be dismissed.

## H.

## COUNT IX.

Count IX represents Randolph's effort to make recovery for delay damages allegedly sustained by its subcontractor, M.I.S. A claim for those damages had been made to Randolph by M.I.S., although never paid.

The problem with the claim is not in a lack of standing on Randolph's part, *see United States v. Blair*, 321 U.S. 730, 737–38, 64 S.Ct. 820, 823–24, 88 L.Ed. 1039 (1944); *U.S. Industries, Inc. v. Blake Construction Co., Inc., supra* at 550–51; it is, rather, in the proof of the claim. In that connection, Randolph merely offered a package of documents it had received from M.I.S. in support of its claim (Def.Ex. # 1047), and added Mr. Vogan's testimony that the amount thereof appeared reasonable. Havens objected to the documents as being without appropriate foundation and thus hearsay.

■■■■■ The objection must be sustained. Vogan's testimony may be sufficient to *authenticate* the documents under Rule 901(2), (*viz*, as being what Randolph claims they are: the vouchers submitted by M.I.S. in support of its claim), but is wholly insufficient to establish the *foundation* elements necessary to render those documents admissible as M.I.S. "business records" under Rule 803(6). *See* Advisory *Committee* Note to Rule 901; *Zenith Radio Corp. v. Matsushita Elec. Ind. Co.*, 505 F.Supp. 1190, 1220–22 (E.D.Pa.1980). Nor, obviously, is Vogan's testimony otherwise sufficient to establish the proposition that M.I.S. in fact sustained a "delay" loss due

to anyone's fault, or to establish what that loss might have been.

Lacking any admissible proof on the subject of damages sustained by M.I.S., Randolph's claim under Count IX must be dismissed.

## I.

### COST OF CAPITAL

In connection with each of its claims involving additional work or expense, Randolph seeks to recover the interest cost on monies borrowed to finance that additional work or expense. Randolph refers to this as its "cost of capital" claim.

The testimony on the matter, while less developed than it might have been, is sufficient to demonstrate that Randolph has in fact incurred an expense item of this nature. As Vogan explained, Randolph borrowed money "throughout [the] job" in order to finance its work activities. There is no reason to suppose this was any less true of its added work than of its other work. The interest rate used by Vogan to calculate the loss—15%—was described by him as "fair and accurate" for the cost of Randolph's borrowing at that time. The record contains no proof to the contrary.

The legal predicate for the claim is somewhat more problematical. Both parties seem to assume the matter is controlled by the "equitable adjustment" principles developed in federal and state government contract litigation. *See*, e.g., *Dravo Corp. v. United States*, 594 F.2d 842, 846, 219 Ct.Cl. 416 (1979); *Md. Port Admin. v. C.J. Langenfelder, etc.*, 50 Md.App. 525, 438 A.2d 1374, 1381–85 (1982). That is not necessarily the case, as such. As the Maryland Court of Appeals pointed out in *Langenfelder, supra* (an excellent resumé of "equitable adjustment" principles and their history, particularly as concerns federal law), the theory has been developed as a

> [p]art of—and to some extent the *quid pro quo* for—an arrangement whereby the contractor agrees not to stop work

when a dispute arises, but to proceed in accordance with the Government's directives, reserving for administrative resolution the question of how much, if any, it is entitled to as a result of changed conditions.

In most private construction contracts, on the other hand, there is neither any specific "equitable adjustment" provision nor any administrative mechanism for its processing. Instead, the parties have traditionally been left to resolve the matter under ordinary contract damage rules, *see generally Restatement (Second) of Contracts, supra* §§ 347, 351, or by seeking (where applicable) an award of prejudgment interest, *see generally* Annot., 60 A.L.R.3d 487 (1974).

Nonetheless, I believe Randolph's "costs of capital" are recoverable here, either as ordinary "direct" (i.e., "foreseeable," *see Restatement (Second) of Contracts, supra* ) damages or on the theory that the language of Randolph's letter of May 9 (as incorporated in the parties' contract) is in fact the practical equivalent of an "equitable adjustment" provision. As to the first point, it was certainly "foreseeable"—indeed inevitable—that increased expenditures by Randolph in connection with extra work, unaccompanied by an equivalent increase in progress payments, would at some point before job completion necessitate that Randolph borrow the additional funds *or* invade its own interest earning assets (capital) to obtain them. Either event would produce an actual loss to Randolph. True, the federal contract cases at one time drew a distinction between a use of borrowed funds and a use of the contractor's own capital, *see Md. Port Admin. v. C.J. Langenfelder, etc., supra*, but the distinction was admitted to be "artificial" even by the court which drew it, *id.*, has been effectively overturned by subsequent federal statutory changes, *id.*, and has been squarely rejected by the only other court to consider the matter, *id.* It makes no greater sense to draw the distinction here. As to the second point, given

the broad terms of Randolph's letter of May 9 (compensation for "*all* added costs, included but not limited to, . . ." etc.) (emphasis added) and the circumstances which then existed, the rational conclusion is that those terms were in fact meant to, and do, serve essentially the same purpose as an "equitable adjustment" provision, encompassing essentially the same elements of expense.

Viewed in this way, Randolph's ability to recover its "cost of capital" expense is no more limited by its ability to "trace" its actual "borrowing" costs than would be the case in applying an "equitable adjustment" provision. *See Md. Port Admin. v. C.J. Langenfelder, etc., supra* at 1385. The only thing necessary is that the court have some reasonable way of determining Randolph's borrowing cost *or* the cost associated with a use of its own capital. *Id.*

Here, at least for an initial time period, I have no reason to reject the 15% figure Mr. Vogan mentioned in connection with amounts Randolph actually borrowed to finance its work on the project. I do, however, have difficulty carrying that 15% figure forward throughout all the more than five succeeding years. There is no proof that Randolph's original borrowing is still an outstanding debt accompanied by a 15% interest rate, and in fact common experience would suggest it is not. That original debt is of course still theoretically reflected either in subsequent borrowings or in a subsequent invasion of Randolph's own capital, but the interest rate applicable to either of those things has hardly remained stable over the years.

In the circumstances, and lacking any better way of calculating things, I will use a 15% figure for the first year following October 12, 1979 (the date Randolph originally submitted to Havens its claims for extra work), and a figure of 9% for the period of time thereafter. This latter percentage is drawn from the interest rate allowed under § 408.020, R.S.Mo.1969 (as amended), in connection with prejudgment interest. I emphasize, however, that this is not an effort to calculate or impose prejudgment interest; it is simply the utilization of a known and reasonable (albeit very conservative) interest rate figure for a period of time as to which I lack more specific information. *See Md. Port Admin. v. C.J. Langenfelder, etc., supra.*

Application of these figures to the claims earlier allowed—except the claim under Count VII for unpaid retainage, which bears its own, separate prejudgment interest—results in an additional award of $105,599.11, current as of the date of this opinion. The amount of Randolph's total judgment will, of course, bear post-judgment interest from today's date.

## J.

## QUANTUM MERUIT

To the extent Randolph's proof supports a recovery of any sort, it has received the full measure thereof under its breach of contract claims. Its alternative claim for quantum meruit will be dismissed.

## V.

## JUDGMENT

Based upon the foregoing, it is

ORDERED that on Havens' claims against Randolph, judgment shall be entered in Randolph's favor and said claims shall be dismissed with prejudice; and it is further

ORDERED that on Counts II, III, VIII and IX of Randolph's counterclaim against Havens, judgment shall be entered in Havens' favor and said claims shall be dismissed with prejudice; and it is further

ORDERED that on Count I of Randolph's counterclaim against Havens, judgment shall be entered in Randolph's favor in the amount of $15,668.01, together with judgment for the additional sum of $8771.07, representing Randolph's "cost of

capital" with respect to the former sum; and it is further

ORDERED that on Count IV of Randolph's counterclaim against Havens, judgment shall be entered in Randolph's favor in the amount of $31,064.30, together with judgment for the additional sum of $17,-389.95, representing Randolph's "cost of capital" with respect to the former sum; and it is further

ORDERED that on Count V of Randolph's counterclaim against Havens, judgment shall be entered in Randolph's favor in the amount of $132,694.15, together with judgment for the additional sum of $74,-283.27, representing Randolph's "cost of capital" with respect to the former sum; and it is further

ORDERED that on Count VI of Randolph's counterclaim against Havens, judgment shall be entered in Randolph's favor in the amount of $9,208.30, together with judgment for the additional sum of $5,154.88, representing Randolph's "cost of capital" with respect to the former sum; and it is further

ORDERED that on Count VII of Randolph's counterclaim against Havens, judgment shall be entered in Randolph's favor in the amount of $70,557, together with prejudgment interest at the rate of 9% per annum from the date of July 10, 1980; and it is further

ORDERED that Randolph shall have and recover its taxable costs herein incurred and expended.